(No. 60593.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JIMMY L. BARTLEY, Appellee.

*Opinion filed November 21, 1985.*

Neil F. Hartigan, Attorney General, of Springfield, and John R. Clerkin, State's Attorney, of Macomb (Jill Wine-Banks, Solicitor General, and Mark L. Rotert and Marcia L. Friedl, Assistant Attorneys General, of Chicago, and John X. Breslin and Gerry R. Arnold, of the State's Attorneys Appellate Service Commission, of Ottawa, of counsel), for the People.

Robert Agostinelli, Deputy Defender, and Stephen Omolecki, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, for appellee.

Robert S. Bailey, and Jane M. Whicher, of Chicago, for amicus curiae American Civil Liberties Union of Illinois.

John Powers Crowley and Matthew F. Kennelly, of Cotsirilos & Crowley, Ltd., and Thomas P. Sullivan, of Jenner & Block, all of Chicago, for amicus curiae National Association of Criminal Defense Lawyers.

JUSTICE SIMON delivered the opinion of the court:

In the early morning of December 19, 1982, the defendant Jimmy L. Bartley, was detained at a roadblock in Macomb and arrested for driving under the influence of alcohol (DUI) in violation of the Illinois Vehicle Code (Ill. Rev. Stat. 1981, ch. 95½, par. 11–501). The circuit court of McDonough County allowed the defendant's motion to suppress his arrest and all evidence obtained as a result of the arrest on the ground that the arrest was not based upon probable cause as required by the fourth and fourteenth amendments to the Constitution of the United States. The State certified that the suppression order substantially impaired its ability to prosecute the defendant and filed a timely notice of appeal. The appellate court affirmed (125 Ill. App. 3d 575), and we granted the State's petition for leave to appeal to this

court (94 Ill. 2d R. 315). Briefs *amicus curiae* were filed on behalf of the defendant by the American Civil Liberties Union and by the National Association of Criminal Defense Lawyers. We note that after oral argument was heard in this case, a panel of appellate judges which did not include those who participated in the decision on appeal here reached the conclusion that a similar type of roadblock in Sangamon County was proper. *People v. Conway* (1985), 135 Ill. App. 3d 887.

The roadblock in this case was conducted as a joint effort of the Illinois State Police, the McDonough County sheriff's department, the Macomb police department, and the Illinois Secretary of State's police. The decision to establish a drivers' license checkpoint in McDonough County was made in early December 1982, by Illinois State Police lieutenant Kenneth Phillips and Illinois State Police captain Noel Oliver. The site selected was the 1200 block of West Jackson Road in Macomb. The checkpoint operated for approximately two hours, beginning at 11 p.m. on Saturday, December 18, and ending sometime after 1 a.m. on Sunday, December 19. At 10 p.m. on the 18th, Lieutenant Phillips conducted a briefing for participating officers at the Illinois State Police area headquarters. The record does not indicate how many of the 15 to 20 officers from the various departments that operated the roadblock attended the briefing, but Illinois State Trooper Carroll McBride, Jr., who participated in the arrest of the defendant, did attend the briefing.

Jackson Road is a five-lane highway, with two lanes each eastbound and westbound and a center turning lane. There are local businesses along the road with off-street areas where cars can pull over. The site was on the main road, leading from Macomb's only all-night restaurant and was also near several taverns. The plan was to stop every westbound vehicle unless traffic backed up,

as occurred once during the operation of the roadblock. The area was lighted, and police vehicles with their red lights flashing were used to funnel the westbound traffic into a single lane. The police officers were instructed to operate in teams of two. One officer stationed on the driver's side would ask for a driver's license and make a physical check of the outside of the vehicle. The second officer stood on the other side of the vehicle and made a physical check of the exterior, the interior, and the rear license plate. The officer on the driver's side used a flashlight to illuminate the interior of the car, including the rear seat if there were passengers there. The driver's license was checked, and any apparent violations were to be run through the Secretary of State's computer.

The police officers who testified stated that either the purpose or the primary purpose of the roadblock was to check drivers' licenses. Captain Oliver, however, testified that another purpose was to identify DUI drivers during the holiday season. The officers were told to be alert for violations other than those relating to drivers' licenses and to take enforcement action where necessary.

The officers testified that the roadblock was to operate according to a standard procedure for drivers' license checks set forth in a manual assembled by the State Police and entitled "Field Supervisor's Guide and Stationary Driver's License Check Policy" which was discussed at the briefing. Although the record does not indicate what specific instructions were given to the individual officers as to how they were to detect DUI violations, the record does indicate that the officers were instructed not to allow a suspected DUI violator to drive his car out of the checkpoint traffic lane, but instead to have one of the officers drive the car off the road.

The arresting officer in this case, Officer John Lucas of the Macomb police, testified that he did not attend the

10 p.m. briefing. When he arrived on duty at approximately 11:30 p.m., he was assigned to the roadblock. He was informed by Lieutenant Phillips that officers working in pairs would check driver's licenses and look for other violations. He did not understand the purpose of the roadblock to be to check for DUI violators, and he did not testify concerning any instructions he received on how to identify or treat suspected DUI offenders. At the time he had been a police officer for at least a year and had seen intoxicated persons on numerous occasions.

The roadblock resulted in 21 arrests, which included 7 for driving under the influence, 10 for illegal transportation of liquor, and the balance for driver's license violations. Sixty-four written warnings were also issued.

Before the roadblock began, Captain Oliver contacted the media. A local television crew filmed both the 10 p.m. briefing and the roadblock itself. A three-minute television videotape admitted into evidence described the roadblock as part of a crackdown on holiday drunk drivers.

When the defendant passed the checkpoint at approximately 12:45 a.m., he was questioned by Officer Lucas and Illinois State Trooper Carroll McBride, Jr. Both testified that when Officer Lucas asked the defendant for his driver's license, he fumbled, producing three or four other papers first, that his speech was slurred, and that he had the odor of alcohol on his breath. He had difficulty shifting his car into "park." When he was asked to step out of his automobile, he stumbled as he walked, and at one point Trooper McBride caught him before he fell. He was unable to pass the field sobriety tests. He refused to submit to a breathalyzer test. At that point, he was placed under arrest.

In his order suppressing the arrest and related evidence, the circuit judge found that the "alleged license check" was a subterfuge to allow police to search for

DUI violators, a finding which is supported by the evidence; he also found that the traffic stop was based neither on probable cause nor on reasonable suspicion.

The question before us is whether the temporary roadblock at issue here violates the prohibition in the fourth amendment to the Constitution of the United States against unreasonable searches and seizures. Although there is no doubt that a roadblock stop is a seizure for fourth amendment purposes (*Delaware v. Prouse* (1979), 440 U.S. 648, 653, 59 L. Ed. 2d 660, 667, 99 S. Ct. 1391, 1396; *United States v. Martinez-Fuerte* (1976), 428 U.S. 543, 556, 49 L. Ed. 2d 1116, 1127, 96 S. Ct. 3074, 3082), we do not agree that the roadblock is *per se* violative of the fourth amendment because individuals are stopped without probable cause. Further, we do not agree with the defendant's argument that, before a driver may be stopped, the police officers must have formed an individualized suspicion that he is violating a law. Instead, our review of Supreme Court holdings and of cases from other jurisdictions convinces us that the question of whether a roadblock violates the fourth amendment is essentially one of reasonableness. The degree of intrusion on the individual's privacy must be balanced against the strength of the public need for the intrusion.

Probable cause is not always required for a search or seizure to be valid under the fourth amendment. *United States v. Martinez-Fuerte* (1976), 428 U.S. 543, 49 L. Ed. 2d 1116, 96 S. Ct. 3074; *Camara v. Municipal Court* (1967), 387 U.S. 523, 18 L. Ed. 2d 930, 87 S. Ct. 1727.

The Supreme Court has defined conditions under which drivers may be detained for various purposes. In *Almeida-Sanchez v. United States* (1973), 413 U.S. 266, 37 L. Ed. 2d 596, 93 S. Ct. 2535, and later in *United States v. Brignoni-Ponce* (1975), 422 U.S. 873, 45 L. Ed.

2d 607, 95 S. Ct. 2574, the court held that the border patrol could stop cars to search for illegal aliens only when the officers had a specific, articulable suspicion that the car might contain illegal aliens. The occupants' appearance of Mexican ancestry was not sufficient. In *Almeida-Sanchez* the officers formed roving patrols which stopped individual cars and conducted full-scale searches. In *Brignoni-Ponce* two officers waited in a car parked by the side of the roadway, stopped individual cars, and asked questions about immigration status. In *United States v. Ortiz* (1975), 422 U.S. 891, 45 L. Ed. 2d 623, 95 S. Ct. 2585, the Supreme Court also required an individualized suspicion for a full-scale search at a checkpoint stop.

The two cases which most clearly illustrate the relevant distinctions are *United States v. Martinez-Fuerte* (1976), 428 U.S. 543, 49 L. Ed. 2d 1116, 96 S. Ct. 3074, in which the court held that neither individualized suspicion nor a warrant is required to question motorists at a permanent immigration checkpoint near the Mexican border, and *Delaware v. Prouse* (1979), 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391, in which the court held that a discretionary spot check of highway motorists for a drivers' license check was invalid without at least a reasonable suspicion that the motorists were unlicensed.

In *Martinez-Fuerte* the court balanced the public interest in stemming the flow of illegal aliens into this country against the objective and subjective intrusion caused by a brief stop for questioning at a clearly identified immigration checkpoint near the Mexican border. The public interest was great, and the court concluded that because both the objective and subjective intrusions were minimal, there was no fourth amendment violation.

The objective and subjective aspects of the intrusion describe, respectively, "the physical and psychological intrusion[s]" caused by a stop. (See *Delaware v. Prouse*

(1979), 440 U.S. 648, 657, 59 L. Ed. 2d 660, 670, 99 S. Ct. 1391, 1398.) The objective intrusion is measured by such factors as the length of the stop, the nature of the questioning, and whether a search is conducted. (*United States v. Martinez-Fuerte* (1976), 428 U.S. 543, 558, 49 L. Ed. 2d 1116, 1128, 96 S. Ct. 3074, 3083.) The subjective intrusion relates to "the generating of concern or *** fright" (428 U.S. 543, 558, 49 L. Ed. 2d 1116, 1128, 96 S. Ct. 3074, 3083) or annoyance (*United States v. Ortiz* (1975), 422 U.S. 891, 895, 45 L. Ed. 2d 623, 628, 95 S. Ct. 2585, 2588) on the part of motorists.

In *Martinez-Fuerte,* each motorist was stopped for only a few seconds. There was no search of either the vehicle or the occupants, only a visual inspection, unless the answers to the questions gave rise to a reasonable suspicion that there was a violation. The court found the objective intrusion minimal. Subjectively, the court held that intrusion at a clearly marked stationary checkpoint is much less offensive than intrusion by a roving patrol. Where there is adequate warning of the official nature and purpose of the stop, where the police uniforms and the flashing lights of the police vehicles establish the legitimacy of the police power of the community, and where it is clear either that every motorist is being stopped or that motorists are being stopped in a systematic, nonrandom fashion, there is none of the fear, apprehension, or anxiety that is occasioned when a motorist believes that he is being randomly singled out by an unidentified roving patrol which stops him without warning. Stopping motorists on a systematic basis also greatly reduces the discretion of the individual officers in the field, and thus greatly reduces the chance that a particular officer can abuse that discretion.

In contrast, *Delaware v. Prouse* involved discretionary spot checks for license and registration and safety-equipment violations. The officer in *Prouse* was a patrol-

man in a police cruiser; he was not acting according to any guidelines, standards, or procedures, either from the police department or the State Attorney General (*Delaware v. Prouse* (1979), 440 U.S. 648, 650-51, 59 L. Ed. 2d 660, 665, 99 S. Ct. 1391, 1394). The public purpose of finding license, equipment, and safety violations in *Prouse*, although legitimate, was both less pressing than the purpose of the checkpoint stop in *Martinez-Fuerte* and also possible of accomplishment by a less intrusive alternative, such as stopping only those vehicles in which there were obvious safety-equipment violations, or stopping drivers who had violated traffic regulations. The subjective intrusion was greater in *Prouse*, since a particular vehicle was singled out and pulled over to the side of the road. Moreover, in contrast to *Martinez-Fuerte*, the individual was selected totally at the discretion of a field officer, for no reason apparent to the driver. This subjective intrusion makes discretionary spot checks more like the roving patrol stops disapproved in *Almeida-Sanchez* than like the systematic, permanent, nonintrusive inquiries approved in *Martinez-Fuerte*.

The Supreme Court has not directly addressed the issue of temporary nighttime roadblocks for the apprehension and deterrence of drunk drivers. In *Prouse* the court suggested in *dicta* that roadblocks might be one alternative involving less discretionary activity by individual police officers than spot checks (*Delaware v. Prouse* (1979), 440 U.S. 648, 663, 59 L. Ed. 2d 660, 673-74, 99 S. Ct. 1391, 1401). A "routine drivers' license checkpoint" set up like the one in this case at a temporary location after dark during which the police shined their flashlights into cars being stopped was involved in *Texas v. Brown* (1983), 460 U.S. 730, 75 L. Ed. 2d 502, 103 S. Ct. 1535. Neither the Supreme Court nor the Texas Court of Criminal Appeals found any problem in the initial stop of the defendant's vehicle "as a part of a li-

cense check" or in the conduct of the police in shining a flashlight to illuminate the interior of the defendant's car. (460 U.S. 730, 739-40, 75 L. Ed. 2d 502, 512, 103 S. Ct. 1535, 1541.) The concern of the court was with the seizure and search of balloons containing contraband in the car.

The question of the validity of police roadblocks to detect and deter drunk drivers is one of first impression in this court. However, it has been addressed by reviewing courts in other jurisdictions. The defendant suggests that the roadblock technique is dangerously close to a police-state tactic. We are able to find only two reviewing court opinions which invalidated a roadblock to apprehend drunk drivers on this basis (*State v. Koppel* (N.H. Aug. 16, 1985), 54 U.S.L.W. 2155 (relying on a State constitutional provision), and *State v. Smith* (Okla. App. 1984), 674 P.2d 562, 564-65). We are not persuaded by their reasoning. The defendant also suggests that the Supreme Court has only approved permanent checkpoints, and that this roadblock is invalid because it is temporary. However, only one court of last resort has invalidated a roadblock for this reason (*State v. Olgaard* (S.D. 1976), 248 N.W.2d 392, 394) and, then, only because of the additional factor that it was impossible to determine from the record how much discretion was vested in the individual police officers. It is significant that three years later the same court approved a temporary game check operated by game wardens and State highway patrol troopers on a highway during which the defendant was cited for driving with a revoked license. *State v. Halverson* (S.D. 1979), 277 N.W.2d 723 (stop with several identifiable State vehicles, uniformed officers and adequate visible signs of who was making stop does not frighten a normal motorist).

We prefer the approach developed by the Supreme Court and applied in other jurisdictions in considering

the constitutionality of roadblocks like the one here. (See *People v. Scott* (1984), 63 N.Y.2d 518, 473 N.E.2d 1, 483 N.Y.S.2d 649 (upholding a roadblock); *Little v. State* (1984), 300 Md. 485, 479 A.2d 903 (upholding a roadblock); *State v. Deskins* (1983), 234 Kan. 529, 673 P.2d 1174 (upholding a roadblock); *State ex rel. Ekstrom v. Justice Court* (1983), 136 Ariz. 1, 663 P.2d 992 (invalidating a roadblock); *Commonwealth v. Trumble* (Mass. Oct. 15, 1985), 38 Crim. Rptr. 2127 (approving a roadblock conforming to State Police guidelines supplying omissions noted in *Commonwealth v. McGeoghegan* (1983), 389 Mass. 137, 449 N.E.2d 349 which invalidated a roadblock); *State v. Marchand* (1985), 104 Wash. 2d 434, 706 P.2d 225 (invalidating a roadblock).) We must therefore determine whether the seizure was a reasonable one under the fourth amendment by balancing the public interest against the objective and subjective intrusion resulting from the stop. Since we deal here only with the type of roadblock which can and should be planned in advance, our appraisal of the roadblock established in this case is not intended to address the validity of an emergency roadblock, for example, a "dragnet" established to trap a dangerous criminal before he can flee the jurisdiction.

Looking first to the public interest involved, there can be no question that drivers under the influence of alcohol pose a substantial threat to the welfare of the citizenry of Illinois. The problem is so serious that, as in other jurisdictions, we hold that this interest is compelling and will therefore justify some intrusion on the unfettered movement of traffic in order to reduce alcohol-related accidents and deter driving under the influence. (See, *e.g., People v. Scott* (1984), 63 N.Y.2d 518, 525, 473 N.E.2d 1, 4, 483 N.Y.S.2d 649, 652; *Little v. State* (1984), 300 Md. 485, 506, 479 A.2d 903, 912.) According to a government survey, there were 43,945 highway fa-

talities in the United States during 1982, and 58% of these involved drunk drivers. (Report No. NTSB/SS—84/01, National Transportation Safety Board, Safety Study, *Deterrence of Drunk Driving; the Role of Sobriety Checkpoints and Administrative License Revocations*.) Drunk driving is particularly disturbing because it results in the loss of innocent life.

The defendant and the *amici* argue that the State should have provided statistics relating specifically to Illinois or even more specifically to Macomb. While we agree that these would be useful, and we encourage law-enforcement officials to maintain such statistics in the future, there is no doubt on the record as it stands that drunk driving is a serious problem in Illinois. With the cost in human life so high, we do not believe that we would be accurately balancing the factors involved were we to delay approval of this technique and condone the further loss of innocent life while the statistics were being developed.

There is some authority for the proposition that highly visible patrols assigned to be on watch for erratic types of driving are a more effective means of apprehending drunken drivers than the means used here and therefore the subjective intrusion on individual rights outweighs the value of a roadblock. (*State v. Koppel* (N.H. Aug. 16, 1985), 54 U.S.L.W. 2155.) The same point is emphasized in *State v. Marchand* (1985), 104 Wash. 2d 434, 706 P.2d 225, and repeatedly in a recent law review article on the propriety of drunk-driving roadblocks (Jacobs & Strossen, *Mass Investigations Without Individualized Suspicion: A Constitutional and Policy Critique of Drunk Driving Roadblocks*, 18 U.C.D. L. Rev. 595 (1985)). We are not persuaded that roadblocks of the kind at issue here lose out in the balancing test for this reason. First, the erratic driver may cause injury to himself or others before he is observed by patrols. Second,

the ability of a drunk driver to avoid erratic movements along a roadway does not mean he will be able to respond to an emergency where prompt reflexes may be of great importance. As the New York Court of Appeals said in *People v. Scott* (1984), 63 N.Y.2d 518, 528-29, 473 N.E.2d 1, 6, 483 N.Y.S.2d 649, 654: "The State is entitled in the interest of public safety to bring all available resources to bear, without having to spell out the exact efficiency coefficient of each component and of the separate effects of any particular component." Third, the carnage caused by drinking and then driving is so serious it warrants resort to both types of apprehension—stopping automobiles which are being driven erratically and roadblocks to detect drunken drivers before they drive in an erratic manner.

The National Transportation Safety Board's Safety Study on deterrence of drunk driving recognizes the deterrent potential of drunk-driving roadblocks. The study points out that they preclude drunk drivers from assuming they will escape trouble simply by driving cautiously. In addition, the study points out that sobriety checkpoints are visible aspects that drunk driving is being combated and they afford police the opportunity to observe a larger number of motorists than would be possible during typical patrol procedures. Admittedly the possibility that a driver will face a roadblock on his way home will not discourage all drunk driving, but on the basis of common sense alone one must conclude that many persons aware of that prospect will have second thoughts about driving.

Having found a legitimate public purpose sufficient to outweigh a minimal intrusion, we next consider whether the intrusion in this case was minimal. There can be little dispute that the objective, physical intrusion was not substantial. According to the record, motorists were detained for only 15 to 20 seconds, as long as there was no

need for additional questioning. These motorists were able to remain in their cars. They were asked to produce driving credentials, a legitimate request. The objective intrusion was thus no greater than that in *United States v. Martinez-Fuerte* (1976), 428 U.S. 543, 49 L. Ed. 2d 1116, 96 S. Ct. 3074, *Little v. State* (1984), 300 Md. 485, 479 A.2d 903, and *People v. Scott* (1984), 63 N.Y.2d 578, 473 N.E.2d 1, 483 N.Y.S.2d 649. Although flashlights were shined into their cars, this by itself does not dramatically alter the nature of the intrusion. It was reasonable to examine the interior to make sure it did not contain weapons with which the occupants could attack the officers who made the stop. Since the stop was made at night, it would have been obvious to the motorists that the light was needed. There was good reason to hold the drunk-driving check at night; the frequency of violations is known to increase at night and particularly as patrons return from drinking establishments which have just closed.

The critical question here, as it has been in virtually every court called upon to confront the problem of DUI roadblocks, is the level of subjective intrusion occasioned by the stop. It is manifest that the fundamental evil to be avoided is the "roving patrol." The fear and annoyance attendant upon roadblock stops which operate like roving patrols may, in some cases, invalidate such roadblocks. (*State ex rel. Ekstrom v. Justice Court* (1983), 136 Ariz. 1, 663 P.2d 992; see also *Commonwealth v. McGeoghegan* (1983), 389 Mass. 137, 449 N.E.2d 349.) However, where the discretion of the police officers is circumscribed, and the roadblock is established and operated in a safe manner, the subjective intrusion is minimal; drivers have no reason to fear either that their safety is endangered or that they are being singled out for discriminatory enforcement. (*Little v. State* (1984), 300 Md. 485, 479 A.2d 903; *State v. Deskins* (1983), 234

Kan. 529, 673 P.2d 1174.) We think that, while not a model roadblock, the subjective intrusion here was sufficiently limited to pass constitutional muster.

The courts have considered a number of factors in assessing the subjective intrusiveness of a roadblock. The crucial inquiry, however, is whether the field officers are acting with unbridled discretion. Although we do not adopt an ironclad formula, we find the factors relied upon by other courts in addressing this question illuminating and therefore proceed to consider them.

The potential for arbitrary enforcement is reduced when the decision to establish a roadblock is made and the site of the roadblock is selected by supervisory-level personnel. (*People v. Scott* (1984), 63 N.Y.2d 518, 522-24, 473 N.E.2d 1, 2-3, 483 N.Y.S.2d 649, 650-51 (the sheriff ordered the roadblocks and senior personnel selected the sites); *Little v. State* (1984), 300 Md. 485, 489-90, 479 A.2d 903, 905 (the roadblock was established pursuant to a State Police pilot program and the site was selected on the basis of data on alcohol-related accidents).) In the instant case, the decision to establish the roadblock was made and the site selected by supervisory personnel, a captain and a lieutenant of the Illinois State Police.

The discretion of field officers is also reduced, and thus the subjective intrusion minimized, when vehicles are stopped in a preestablished, systematic fashion. (*State v. Deskins* (1983), 234 Kan. 529, 542, 673 P.2d 1174, 1185 (all vehicles were stopped); *People v. Scott* (1984), 63 N.Y.2d 518, 525, 473 N.E.2d 1, 3, 483 N.Y.S.2d 649, 651 (all vehicles were stopped); *Little v. State* (1984), 300 Md. 485, 506, 479 A.2d 903, 913 (all vehicles were stopped).) Here, each westbound vehicle was stopped; that procedure was sufficiently systematic to avoid any concern by motorists that they were being singled out.

Another important factor in checking police discretion

is the existence of guidelines on the operation of the roadblock. In this case the State Police held a briefing immediately prior to establishing the roadblock. At that briefing, the field officers were instructed from a State Police manual on the proper procedure for approaching the vehicle, requesting the drivers' license, checking for other violations, and sidetracking those drivers found to have violations. The only instructions regarding DUI violations which appear on the record here were the generalized orders to be alert for other violations and not to permit a driver who appeared to be drunk to drive his car any farther. Although some courts have noted with approval that officers received more detailed guidelines on detecting DUI violators, including factors to be considered in determining intoxication (see *People v. Scott* (1984), 63 N.Y.2d 518, 526, 473 N.E.2d 1, 4, 483 N.Y.S.2d 649, 652), the absence of such guidelines is not fatal here. From the point of view of a driver stopped as part of what was clearly a systematic operation, the fear of arbitrary enforcement is not markedly greater because the police officer is not given precise instructions on how to detect a drunken driver; indeed, such instructions would be of only marginal utility where experienced officers are called upon to determine whether a driver is intoxicated.

Both officers here had enough experience to know when they observed someone who, by reason of the consumption of alcohol, might be a menace if permitted to continue driving. For much the same reason, we do not regard as vital the fact that Officer Lucas, who arrested the defendant, was not at the briefing. Trooper McBride, who was working the roadblock in conjunction with Lucas, did attend the briefing, and defendant was subjected to field sobriety tests apparently at McBride's suggestion.

In contrast to the conditions present in the instant

roadblock, in those cases applying the balancing test in which roadblocks have been invalidated, few, if any, restraints on police discretion existed. In *State ex rel. Ekstrom v. Justice Court* (1983), 136 Ariz. 1, 663 P.2d 992, the court relied upon the fact that the roadblocks were set up by local highway patrolmen acting without guidelines and on the irregular operation of the roadblocks in finding that the danger of arbitrary enforcement was too high. Similarly, the Washington Supreme Court recently invalidated as an exercise of unfettered discretion a roadblock which was decided upon by two State troopers and was carried out by stopping vehicles on a nonsystematic "spot check" basis. (*State v. Marchand* (1985), 204 Wash. 2d 434, 706 P.2d 225.) See also *Commonwealth v. McGeoghegan* (1983), 389 Mass. 137, 449 N.E.2d 349.

In addition to procedures which guard against unbridled discretion of police officers, the anxiety to motorists which may result from a roadblock is allayed if there is a sufficient show of the official nature of the operation and if it is obvious that the roadblock in fact poses no safety risk. (*People v. Scott* (1983), 63 N.Y.2d 518, 526, 473 N.E.2d 1, 5, 483 N.Y.S.2d 649, 652; *Little v. State* (1984), 300 Md. 485, 507, 479 A.2d 903, 914.) In this case, the several police vehicles with flashing lights and the uniformed officers were sufficient to demonstrate that legitimate police power was behind the operation. The safety features were also adequate as the roadblock was set up on a five-lane highway in a well-lighted, moderately trafficked area.

Advance publicity of the intention of the police to establish DUI roadblocks, without designating specific locations at which they will be conducted, also serves to minimize any apprehension motorists may otherwise experience upon encountering one. (*Little v. State* (1984), 300 Md. 485, 479 A.2d 903; *State v. Deskins* (1983), 234 Kan. 529, 673 P.2d 1174.) In fact, if a major

goal of a roadblock searching for drunken drivers is deterrence, that goal is promoted by publicity. The more aware drivers are that they may be stopped at such a roadblock, the more likely they will be to seek alternate means of transportation when they are drinking or to refrain from drinking when they know they will be driving. Here, the police did not publicize the fact that the purpose of the roadblock was to detect and deter drunken drivers. Given the other factors serving to reduce the subjective intrusion, the lack of advance publicity is not sufficient to invalidate this roadblock.

Finally, we note that the circuit judge found, as a matter of fact, that the true purpose of this roadblock was to apprehend DUI violators and that the drivers' license check was a subterfuge. The State, in argument before this court, did not quarrel with this finding. The official subterfuge with respect to the true purpose of the roadblock is not entitled to significant weight in the balancing process. The subjective reaction of drivers stopped at the roadblock would not have been substantially different had the participating officers been instructed that the primary purpose of the stop was to check on drunken drivers rather than on license violations. In this case the officers' observations of evidence of intoxication entailed slight, if any, additional intrusion on defendant.

We hold that no probable cause and no individualized suspicion is required to establish a roadblock designed to deter and detect DUI violators, and that this roadblock was established and operated in accordance with constitutionally acceptable procedures. On this record we do not believe that the individual officers in the field had unlimited discretion or that this roadblock had the characteristics of a roving patrol. Inasmuch as the State interest here is compelling and both the objective and subjective intrusion were minimal, the roadblock did not

violate the strictures of the fourth amendment. We therefore reverse the appellate court and the suppression order entered by the circuit court and remand this cause to the circuit court for further proceedings.

*Reversed and remanded.*