THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT E. ADAMS, Defendant-Appellant.

Second District   No. 2—97—0079

Opinion filed November 19, 1997.

Hercules Paul Zagoras, of Hercules Paul Zagoras & Associates, Ltd., of Waukegan, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Gary K. Chan, of Chicago, for the People.

JUSTICE INGLIS delivered the opinion of the court:

Following a bench trial, defendant, Robert E. Adams, appeals his conviction of driving while license revoked (625 ILCS 5/6—303(a) (West 1996)). Defendant argues that the court erred in failing to suppress the evidence seized as the result of a roadblock in violation of his constitutional rights. We agree and reverse.

Defendant was stopped at a roadblock on May 14, 1996, in Waukegan, Illinois. The purpose of the roadblock was to determine whether he was a city resident and whether he had a current city sticker for his vehicle as required by the city's ordinances. As a result, defendant was charged with driving while license revoked. After finding defendant guilty of driving while license revoked, the court sentenced him to 18 months' conditional discharge and ordered him to pay a $200 fine and to perform 240 hours of community service. The record contains no complaint against defendant for failing to have a current city sticker.

Before the trial, defendant filed a motion to suppress evidence which was initially denied as untimely. On the day of the trial, the court stated it would consider the motion to suppress simultaneously as part of the trial. The State and defendant stipulated that defendant was stopped without a warrant to search or arrest defendant.

At trial, Officer Louis Rodriguez testified that, on May 14, 1996,

at about 9 a.m., he was a Waukegan patrol officer on "city sticker detail" in the area of Melrose and Butrick, a four-way stop intersection. There were four officers in uniform. They stood on each corner next to the stop sign and observed the traffic. As a car pulled up to the intersection, an officer would look to see if the vehicle had a valid Waukegan city sticker on the windshield. There were marked squad cars in the area. Sergeant Moore told the officers to go there for the detail. His instructions were to stop cars that entered the intersection if they did not have valid Waukegan city stickers. There were no other instructions.

Rodriguez testified that he noticed that a red Jeep driven by defendant which stopped at the stop sign did not have a Waukegan city sticker on the windshield. Rodriguez pulled the car over. The officers were only allowed to issue city sticker citations to Waukegan residents. Rodriguez had to ask defendant for his driver's license to verify that he was a resident of Waukegan. As part of the city sticker check, only those cars that did not have a sticker were pulled over. Rodriguez informed defendant of the reason for the stop. Defendant said he did not have his license with him. Rodriguez asked for proof of insurance. After obtaining defendant's name and date of birth, Rodriguez called in a driver's license check and learned that the license was revoked. At trial, an abstract of defendant's driving record was admitted into evidence which showed defendant's license was revoked on the date in question.

On cross-examination, Rodriguez stated that Sergeant Moore was with the officers at the intersection. Rodriguez did not speak with the police chief or the watch commander that day. It was Moore who "conceived" of the city sticker check that Tuesday. Rodriguez said he saw defendant's windshield as he was driving north on Butrick. The officer who spotted a car without the sticker was the one who conducted the interrogation. The sole purpose of the stop was to check the vehicle stickers. When asked if there was any publicity given in advance of this check, Rodriguez explained that he thought the stickers expired in April, that the residents were given at least a month of leeway to obtain their stickers, and that the newspaper reported the sticker requirement would be enforced. Rodriguez acknowledged that he did not know about the enforcement procedure until that morning. He stated he gave defendant a ticket for not having the vehicle sticker, but he could not find a copy of it in the file; the file did not show that defendant was issued a ticket. Rodriguez did not have anything that reflected the procedures to be followed in making the stop. He stated that Moore was his supervisor.

Defendant testified that he was a Waukegan resident. He kept all

of his old Waukegan vehicle stickers on the Jeep. He stated he was not given a ticket on May 14 for not having a city vehicle sticker. On cross-examination, defendant stated he had a 1995 sticker on his vehicle on May 14, 1996. When asked if he recalled purchasing his 1996 sticker on May 31, he replied that he bought all of his stickers when due. He had four trucks and bought all of his stickers at the same time but could not recall the exact date.

Before finding defendant guilty of driving while license revoked, the court denied his motion to suppress, taking into consideration *People v. Bartley*, 109 Ill. 2d 273 (1985). In *Bartley*, the supreme court held that a temporary roadblock planned in advance and set up to check drivers' licenses and detect motorists driving under the influence (DUI) met certain criteria so that the roadblock did not violate the constitutional prohibition against unreasonable searches and seizures. The supreme court concluded that the State had a compelling interest in reducing alcohol-related accidents and this interest outweighed the intrusion on motorists.

Although the trial court here found the seriousness of driving without paying a city sticker "minuscule" compared to driving under the influence of alcohol, it nevertheless concluded that the stop was constitutionally permissible. We must determine whether the roadblock in this case passes constitutional muster. The State does not dispute that it had the burden of proof to show that the roadblock and stop were justified.

■ A trial court's decision regarding whether to suppress evidence will not be overturned on review unless that decision is manifestly erroneous. *People v. Galvin*, 127 Ill. 2d 153, 162 (1989). In Illinois, a warrantless search or seizure is presumed unreasonable *per se* unless it comes within a specific, well-delineated exception to the warrant requirement, and the ultimate test of the constitutionality of a search or seizure is its reasonableness. *People v. McGee*, 268 Ill. App. 3d 32, 40 (1994). The reasonableness of a search or seizure depends upon balancing the public's interest against the individual's right to be free from arbitrary interference by law officers. *People v. Strawn*, 210 Ill. App. 3d 783, 786 (1991).

Here, we are confronted with a limited, well-delineated exception to the constitutional requirements of probable cause or reasonable and individualized suspicion necessary to effectuate a warrantless but lawful stop. See *Bartley*, 109 Ill. 2d at 280-81, 292. The fundamental evil to be avoided is the "roving patrol," for the fear and annoyance attendant upon roadblock stops that operate like roving patrols may serve to invalidate such roadblocks. *Bartley*, 109 Ill. 2d at 288. Because of the potential for abuse of the roadblock procedure—such

as when officers in the field act with unbridled discretion (see 4 W. LaFave, Search & Seizure § 10.8(a), at 678-79 (3d ed. 1996); *Bartley*, 109 Ill. 2d at 289), we will carefully examine and balance the factors that have been developed to determine the constitutionality of a roadblock.

It is well settled that a fourth amendment seizure occurs when a vehicle is stopped at a roadblock or checkpoint. *People v. Scott*, 277 Ill. App. 3d 579, 583 (1996), citing *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 450, 110 L. Ed. 2d 412, 420, 110 S. Ct. 2481, 2485 (1990). In *Sitz*, the Court considered whether a highway sobriety checkpoint program established by the Michigan State Police department and its director was permissible under the fourth amendment. The director appointed a committee which included police representatives and state prosecutors who created guidelines setting forth the procedures governing checkpoint operations, site selection, and publicity. The Court found that *United States v. Martinez-Fuerte*, 428 U.S. 543, 49 L. Ed. 2d 1116, 96 S. Ct. 3074 (1976), and *Brown v. Texas*, 443 U.S. 47, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979), were relevant authorities in applying a balancing test to determine the constitutionality of a roadblock stop.

In *Brown v. Texas*, the Court noted that the consideration of the constitutionality of seizures less intrusive than traditional arrest involves (1) weighing of the gravity of the public concern served by the seizure; (2) the degree to which the seizure advances the public interest; and (3) the severity of the interference with individual liberty. A central concern in balancing these competing considerations is to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasion solely at the unfettered discretion of officers in the field. *Brown*, 443 U.S. at 50-51, 61 L. Ed. 2d at 361-62, 99 S. Ct. at 2640. The *Sitz* Court began its analysis by considering the gravity of the public interest involved and posited that no one can seriously dispute the magnitude of the drunken driving problem and the states' interest in eradicating it. The Court next found that the objective intrusion, measured, for example, by the duration of the stop (25 seconds) was minimal. The Court found the subjective intrusion (*i.e.*, the fear, surprise, and annoyance of law-abiding motorists) was minimized because the checkpoints were selected pursuant to guidelines and uniformed officers stopped every approaching car briefly. The Court also concluded that there was empirical data sufficient to show that the roadblock was sufficiently effective to advance the public interest in detecting drunken drivers.

Also relying on *Brown* and *Martinez-Fuerte* (but prior to the *Sitz* decision), our state supreme court adopted a similar balancing analy-

sis in *Bartley*, 109 Ill. 2d 273. The DUI roadblock there was conducted as a joint effort of the Illinois State Police and cooperating police departments. The decision to establish the checkpoint was made by a state police lieutenant and a captain. The lieutenant conducted a briefing for participating officers at the state police headquarters. All westbound vehicles were to be stopped and the officers were to operate according to a standard procedure set forth in a state police manual. Before the roadblock began, a captain contacted the media, and a television crew filmed the briefing and the roadblock. The supreme court stated that it was only considering the type of roadblock which can and should be planned in advance. *Bartley*, 109 Ill. 2d at 285.

The *Bartley* court first examined the public interest involved and found that, because DUI poses a substantial threat to the welfare of the citizenry, the interest involved was "compelling." The court went on to weigh this public interest against the objective and subjective intrusions resulting from the stop. The court next found the objective intrusion on the motorist was not substantial as the stop was brief (15 to 20 seconds), motorists were able to remain in their cars, and they were merely asked to produce driving credentials.

The court then examined several factors to assess the subjective intrusiveness of the roadblock, pointing out that the critical factor is whether the field officers are acting with unbridled discretion. Subjective intrusion concerns the fear, surprise, and annoyance of citizens at being stopped. Where the discretion of officers is circumscribed and the roadblock is established in a safe manner, drivers have no reason to fear either that their safety is endangered or that they are being singled out for discriminatory treatment. *Bartley*, 109 Ill. 2d at 288.

■ According to *Bartley*, arbitrary enforcement and the use of discretion by officers in the field are reduced and the subjective intrusion minimized when (1) the decision to establish the roadblock and the selection of the site are made by supervisory personnel (such as a sheriff, a state police lieutenant or captain); (2) the vehicles are stopped in a preestablished, systematic manner to avoid any concern by motorists that they are being singled out (for example, stopping all westbound vehicles); (3) there are preexisting guidelines for the operation of the roadblock (such as a state police manual); (4) there is a sufficient show of the official nature of the operation and it is obvious that the roadblock in fact poses no safety risk; and (5) there is advance publicity of the intention of the police to establish the roadblock. It is clear that vehicles may not be stopped in a random "spot check" manner. *Bartley*, 109 Ill. 2d at 289-91; *Scott*, 277 Ill. App. 3d at 583. The *Bartley* court found that these factors were generally

satisfied in the case before it; the court concluded that there was a compelling interest in deterring DUI while the objective and subjective intrusions were minimal so that the roadblock did not violate the fourth amendment.

■ We first examine whether the public interest in the present case was sufficient to warrant the intrusive police procedure entailed in stopping all citizens traveling within the city, regardless of residency, to see whether they were in current compliance with the sticker requirement. We conclude that, although the vehicle sticker requirement has an apparent legitimate revenue-raising purpose, this hardly equates with the "compelling" public safety purpose of a DUI checkpoint and does not qualify as a "grave" public concern sufficient to warrant this type of police intrusion.

At trial, the State made no effort to explain the purpose, nature, or importance of the public interest in enforcing this type of city registration. The usual $20 fee itself is relatively small, and a portion is distributed to the administrative fund to cover the cost of collection; the remainder is apportioned and distributed to the police fund and the street maintenance fund. See City of Waukegan Municipal Code §§ 21—246 through 21—255 (19___ ). The public interest to be advanced is, in the trial judge's own words, "minuscule" by comparison to *Bartley's* compelling public safety concern of deterring DUI. It is interesting to note that this show of police power was used to detain motorists on their way to work during what appeared to be a 30-day grace period before any significant penalty would attach. The ordinance appears to be administrative and regulatory in nature rather than being directly related to public health, safety, and the prevention of crime.

We are aware that, in *People v. Taylor*, 259 Ill. App. 3d 289, 291 (3d Dist. 1994), the reviewing court found that there was a "valid public interest in enforcing a municipal revenue ordinance which requires the purchase of motor vehicle stickers." However, the court was unable to weigh this public interest against the other factors concerning the degree of intrusion posed by a roadblock due to an insufficient record. Nevertheless, the *Taylor* court reversed the trial court's order suppressing evidence derived from a roadblock. Because *Taylor* never weighed the public interest against other factors as required by *Bartley*, we decline to follow that decision here. We have found no other case in any other jurisdiction where a checkpoint to enforce a city sticker ordinance was held constitutionally permissible.

Although the length of the stop and license check is unclear in the record, the evidence does not otherwise show that there was a

substantial objective intrusion. According to Rodriguez, he asked defendant for licensing and insurance information, ran a license check, and learned that defendant was a city resident subject to the sticker requirement. However, the subjective intrusion factors—those that arouse surprise, fear, and annoyance in the motoring public—are problematic.

■ First, the decision to set up this checkpoint and select its location appears to have been made extemporaneously by a sergeant in the field. The leading cases that have upheld checkpoints have explained, implicitly or explicitly, that such decisions were made by officials or officers at the policy-making level and the checkpoints were planned in advance. In *Sitz*, 496 U.S. 444, 110 L. Ed. 2d 412, 110 S. Ct. 2481, the sobriety checkpoint was established by the state police department, its director, and a committee which created (presumably written) guidelines setting forth procedures governing checkpoint operations, site selection, and publicity. In examining whether such a checkpoint was effective in advancing the public interest, the Court clearly implied that it was the domain of "politically accountable officials" to decide "which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger." *Sitz*, 496 U.S. at 453, 110 L. Ed. 2d at 422, 110 S. Ct. at 2487.

In *Martinez-Fuerte*, the Court found that the intrusion posed by fixed immigration checkpoints (as opposed to roving patrols) was to some extent minimized and thus permissible under the circumstances, and it explained in part:

> "The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest. The location of a fixed checkpoint is not chosen by *officers in the field*, but by *officials responsible for making overall decisions* as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class." (Emphasis added.) *Martinez-Fuerte*, 428 U.S. at 559, 49 L. Ed. 2d at 1129, 96 S. Ct. at 3083.

The Court concluded that the need for a warrant in such a case was "reduced when the decision to 'seize' is not entirely in the hands of the officer in the field, and deference is to be given to the administrative decisions of higher ranking officials." *Martinez-Fuerte*, 428 U.S. at 566, 49 L. Ed. 2d at 1133, 96 S. Ct. at 3086-87.

In *Bartley*, 109 Ill. 2d 273, one of the reasons the court found the DUI checkpoint permissible was because the decision to establish the

checkpoint, its location, and the procedures to be followed was made by a state police lieutenant and a captain; the roadblock was operated according to a standard procedure set forth in a state police manual.

In *State v. Larson*, 485 N.W.2d 571, 572-73 (Minn. Ct. App. 1992), the reviewing court found that a driver's license checkpoint did not pass constitutional muster because (1) there was no evidence that the checkpoint was authorized or the location was selected by an officer higher than a field supervisor, a sergeant; and (2) there were no administrative, written guidelines for the operation of the checkpoint which would limit the discretion of officers in the field. The court also found that the state had failed to present evidence of the effectiveness of the checkpoint in advancing the public interest. See *State v. One 1987 Toyota Pickup*, 233 Neb. 670, 447 N.W.2d 243 (1989) (checkpoint found unconstitutional where sergeant and troopers in field established checkpoint without involvement or approval of state patrol high command).

*State v. Park*, 810 P.2d 456 (Utah Ct. App. 1991), concerned a roadblock in which all vehicles except large trucks were stopped. The roadblock was supervised by a state highway patrol sergeant accompanied by about 15 officers. The roadblock was publicized earlier in local newspapers. As a result of the stop, defendant was charged with a drug offense. At the suppression hearing, although the sergeant testified that the roadblock was authorized by his supervisor, there was no evidence presented that the roadblock was carried out pursuant to a plan having explicit, neutral limitations on the officers' conduct or that it was developed by *politically accountable officials*; there was no evidence that the authorization process involved any balancing of interests. Under the circumstances, the reviewing court concluded that the roadblock violated defendant's fourth amendment right as it did not conform to the standards established in *Sitz*.

In *Holt v. State*, 887 S.W.2d 16 (Tex. Crim. App. 1994), relying on *Sitz*, the appeals court held a city police department's sobriety checkpoint unconstitutional where it was not expressly authorized and implemented by a statewide, politically accountable governing body. *Cf. State v. Sanchez*, 856 S.W.2d 166 (Tex. Crim. App. 1993) (license and insurance roadblock check held unconstitutional where officers in field acted without authorization or guidance of superior officer and without established, authoritatively standardized procedures concerning location and operation of roadblock and where there was no evidence demonstrating effectiveness of roadblock).

In the present case, Rodriguez was acting on a verbal directive

from his sergeant, who was also in the field. Rodriguez was merely to stop vehicles not having a current city sticker. There is no evidence showing that this roadblock was established by politically accountable or policy-making level officials. The officer had some discretion in determining which vehicles to stop and, if there was a violation after stopping the motorist, he then had discretion in determining residency and compliance. See *Scott*, 277 Ill. App. 3d at 583 (under circumstances, determination of driver's residence involved use of discretion). Of course, this procedure likely would have subjected nonoffending motorists who were not city residents to some form of interrogation. There is no evidence that there were preexisting, written, standardized guidelines regarding the selection of a site, the procedures to be followed in operating the roadblock, or the manner and length of the detention and interrogation. There is no indication whether the site was selected in accordance with the safety concerns of the public in mind or whether motorists were unduly detained by traffic backups. They likely would have been on their way to work at that time of day. Since it could not have been clear to the motorists why some vehicles were being pulled over while others were not, it is likely that the stops generated the fear and annoyance that accompany being singled out of a line of traffic.

Although there is no indication that there was any road sign to alert approaching motorists of the checkpoint, the presence of uniformed officers and squad cars would appear to have been sufficient to show the official nature of the operation. However, the State did not demonstrate whether the safety risk to the public was considered or minimized. Furthermore, the only evidence suggesting advance publicity about the operation was Rodriguez' vague comment that the newspaper reported there would be some enforcement of the sticker requirement. There is no evidence that the public was informed there would be a roadblock. Indeed, Rodriguez did not know of the roadblock until the morning of the stop.

Finally, the State presented no testimony or empirical evidence regarding the effectiveness of this procedure in advancing the interest at stake—the enforcement of a sticker requirement which appears to be essentially a revenue-producing device. See *Brown*, 443 U.S. at 51, 61 L. Ed. 2d at 360, 99 S. Ct. at 2640 (court must weigh degree to which the seizure advances the public interest). We recognize that "the choice among such reasonable [law enforcement] alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers." *Sitz*, 496 U.S. at 453-54, 110 L. Ed. 2d at 422, 110 S. Ct. at 2487. However, we do not

believe that courts must "blindly defer to whatever enforcement techniques are chosen by officials" as courts must analyze these techniques "to insure that they are in fact reasonable" and must not abdicate their responsibility in protecting constitutional rights. *Holt*, 887 S.W.2d at 19; see also *Martinez-Fuerte*, 428 U.S. at 559, 49 L. Ed. 2d at 1129, 96 S. Ct. at 3083-84 ("a claim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review").

There are undoubtedly less intrusive methods of enforcing this city sticker requirement, such as by checking city records, posting or mailing notices, or issuing tickets as the result of other legitimate traffic stops. These methods are for the appropriate law enforcement officials to decide. At the very least, however, the decision to use an intrusive roadblock should be made by politically accountable public officials or higher ranking officers at the policy-making level. There was no evidence of the number or percentage of violators discovered in relation to the number of motorists stopped or whether the majority of motorists stopped were even residents subject to the ordinance. The effectiveness of this procedure is speculative at best.

We determine that the interest in enforcing the city sticker ordinance is less than compelling when weighed against the degree of intrusion visited upon ordinary motorists. The State presented insufficient evidence showing that the checkpoint (1) was authorized and selected by policy-level or politically accountable officials; (2) was operated pursuant to sufficiently specific, standardized, preexisting guidelines to limit officer discretion; (3) was operated in a safe manner; (4) was publicized clearly and in advance; and (5) was actually effective in advancing the interest in question.

We hold that the checkpoint stop of defendant violated the constitutional prohibition against unreasonable searches and seizures, and the trial court's decision not to suppress the evidence derived from that stop was manifestly erroneous. Since the State could not have prevailed without this evidence, we reverse defendant's conviction and sentence outright.

The judgment of the circuit court of Lake County is reversed.

Reversed.

McLAREN and HUTCHINSON, JJ., concur.