# Illinois Official Reports

## Appellate Court

---

### *People v. Butorac*, 2013 IL App (2d) 110953

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TIMOTHY S. BUTORAC, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-11-0953 |
| Filed | December 27, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The warrantless and suspicionless stop of defendant's boat by conservation officers pursuant to a regular and systematic operation of stopping every boat the officers saw to check the boaters' registration and safety equipment resulted in a minimal intrusion into their activities, and there was no indication that the officers were acting arbitrarily or with unbridled discretion; therefore, the trial court did not err in denying defendant's motion to quash his arrest and suppress the evidence that led to his conviction for operating a watercraft while under the influence of alcohol or his motion to reconsider, notwithstanding the fact that defendant made a *prima facie* case of an unreasonable seizure, since the State countered defendant's *prima facie* case with evidence that neither a "waterway roadblock" nor a fixed checkpoint was a viable alternative under the circumstances of the waterway where defendant was boating and the minimal intrusion by the officers was outweighed by the State's interest in promoting safe boating. |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 10-CV-138; the Hon. Bruce W. Lester, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Thomas A. Lilien and Barbara R. Paschen, both of State Appellate Defender's Office, of Elgin, for appellant.

Joseph H. McMahon, State's Attorney, of St. Charles (Lawrence M. Bauer and Kathryn E. Kohls, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justice Schostok concurred in the judgment and opinion.
Justice McLaren dissented, with opinion.

**OPINION**

¶ 1      Defendant was convicted of operating a watercraft while under the influence of alcohol (625 ILCS 45/5-16(A)(1)(b) (West 2010)). He was convicted of that offense after officers stopped his boat pursuant to section 2-2(a) of the Boat Registration and Safety Act (Act) (625 ILCS 45/2-2(a) (West 2010)), which permitted the officers to "board and inspect any boat at any time" to determine if the Act was being complied with. On appeal, defendant argues that the trial court should have granted his motion to quash his arrest and suppress evidence because the stop of his boat was unconstitutional. Before the trial court and in his briefs on appeal, defendant pursued both facial and as-applied challenges to section 2-2(a) of the Act. At oral argument, however, defendant withdrew his facial challenge. As a result, the only issue before us is whether section 2-2(a), as applied to defendant in this case, is unconstitutional. Because we conclude that the State's interest in promoting the safety of persons and property in connection with boating outweighed the minimal intrusion occasioned by the officers' stop of defendant's boat, we affirm the trial court's judgment.

¶ 2                                    BACKGROUND

¶ 3      The procedural history of this case is unusual. Defendant's motion to quash his arrest and suppress evidence advanced nothing substantive in support of his as-applied challenge to section 2-2(a) of the Act. The body of the motion consisted entirely of a facial challenge to the constitutionality of section 2-2(a). At the conclusion of the motion, defendant simply asserted that section 2-2(a) was also unconstitutional as applied to him, with no supporting analysis.

¶ 4      We do not have a transcript of the hearing on defendant's motion. The parties have supplemented the record, however, with an "Agreed Statement of Facts for Motion to Quash," in accordance with Illinois Supreme Court Rule 323(d) (eff. Dec. 13, 2005). It indicates that the parties stipulated to the following facts for purposes of defendant's motion: (1) Illinois Conservation Police officers Eric Schreiber and Keith Siedsma stopped defendant's boat on

the Fox River pursuant solely to section 2-2(a) of the Act; (2) the Fox River is not connected to any lakes, seas, or oceans; and (3) defendant had been doing nothing suspicious at the time. The agreed statement of facts further indicates that the oral argument at the hearing on defendant's motion related to defendant's facial challenge to the statute's constitutionality. According to the agreed statement of facts, the trial court denied defendant's motion, making no findings pertinent to an as-applied challenge to the statute.

¶ 5    Defendant then filed a motion to reconsider. In his motion, for the first time, defendant included significant argument in support of his as-applied challenge. In arguing that the statute was unconstitutional as applied to him, he relied on the stipulated facts from the hearing on his motion to quash and suppress. The State offered no additional evidence in response to defendant's motion to reconsider. The trial court denied the motion to reconsider, finding that there had been "no showing to overcome constitutionality of this statute" and that there was a "superior state interest in keeping state waterways safe."

¶ 6    Pertinent to the issue on appeal, Officers Siedsma and Schreiber testified at trial as follows. On the afternoon and evening of July 9, 2010, they were on duty on an unmarked, 14-foot boat on the Fox River. It was a small boat with a tiller-operated motor. The officers testified that the "St. Charles Pool," the stretch where they were working, is located between two dams and is approximately 200 yards wide. It is "one of the more heavily populated areas for boating" and has "a lot of boat traffic." One dam is located in St. Charles and the other dam is located in South Elgin. There were no "lane lines" or "buoy markers" on that portion of the river. Officer Siedsma described their duties as "boat patrol"; Officer Schreiber used the term "routine boat patrol." Officer Siedsma elaborated on what he meant by "boat patrol":

"Under the provisions of the Boat Safety Act, we are out enforcing boat laws, boat safety laws.

We check for valid registration and boat safety equipment.

So we stop vessels and check for life jackets, what we call personal flotation devices, fire extinguishers, sounding devices, or a horn or a whistle, valid registration. Those are the main things that we look for."

Officer Schreiber testified similarly: "[W]e were conducting safety inspections based upon *** whether they have life jackets, a workable U.S. Coast Guard approved fire extinguisher, a horn or whistle and registration." The officers were in uniform. Schreiber described the uniform as consisting of an identifiable shirt, pants, black work boots, a hat with a star emblem representing law enforcement, and a life jacket with a star on it.

¶ 7    The officers put their boat in the water at around 2 p.m. and stopped every boat they saw to check for registration and safety equipment, inspecting 20 to 25 boats before they stopped defendant's boat. At about 6:45 p.m., as their boat was stationary about a quarter-mile north of the Boy Scout Island boat ramp, the officers saw defendant's boat approach from the north. He was steering and David Yeomans was on board. The officers headed north, pulled up alongside defendant's boat, and stopped it. Officer Schreiber testified that the officers stopped defendant's boat because they had neither seen nor stopped the boat previously that evening. Because the officers' boat did not have a siren, they hailed the boat by hand. According to

Officer Schreiber, they would hail a boat by pulling up very close to the boat, identifying themselves as conservation officers, and asking the operator of the boat to put his boat in neutral. The officers identified themselves as conservation officers to defendant. The officers then asked to see defendant's safety equipment and registration, which he gave them permission to check. The officers did not board defendant's boat, and defendant was able to show the officers the requested items "pretty much from where he was seated." Defendant was "very friendly" and "was joking, he was happy the whole time." After the officers had checked defendant's safety equipment, they noticed numerous empty alcoholic-beverage bottles and that defendant had glassy, bloodshot eyes and slurred speech. The officers tested defendant for sobriety and then arrested him.

¶ 8    Yeomans, defendant's passenger, testified that he and defendant put their boat in the water around 11:30 a.m. or 12 p.m. They were "cruising around *** like you do on the river." They went to "the sandbar" where people would anchor their boats and congregate to "play football and such." At some point, they left the sandbar to pick up a friend from Boy Scout Island. It took about 5 to 10 minutes to get there. On the way, "two guys on a boat waved [them] down" and Yeomans and defendant "stopped and realized they were uniformed DNR [Department of Natural Resources] officers." According to Yeomans, they were only "yards away" from Boy Scout Island when the officers stopped their boat. During the officers' interactions with defendant, they "were joking around with him[,] *** kind of like they were buddies with him or something." Defendant "was real cooperative and just doing all the things they were asking him to do." As pertinent here, the remainder of Yeomans' testimony was consistent with the officers' testimony.

¶ 9    Defendant was convicted and timely appeals.

¶ 10                              ANALYSIS

¶ 11    On appeal, defendant's argument essentially is that the officers' seizure of his boat constituted a "waterway roadblock" akin to the types of motor-vehicle roadblocks that have been deemed to violate the fourth amendment. He concedes that section 2-2(a) of the Act authorized the seizure but contends that the officers acted with "unbridled discretion" and should have employed measures like those required for motor-vehicle roadblocks.[1]

¶ 12    Before reaching the merits of defendant's argument, it is important to clearly outline the standards guiding our review, especially in light of the unusual procedural history of this case. In considering an as-applied challenge to a search or seizure authorized by statute, the question is not whether the search or seizure was authorized by statute but, rather, whether the search or seizure was reasonable under general fourth amendment principles given the particular facts of the case. See *Sibron v. New York*, 392 U.S. 40, 61 (1968) (" 'Just as a search authorized by

---

[1]Both the United States Constitution and the Illinois Constitution prohibit unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Generally, the Illinois provision is construed in "lockstep" with the fourth amendment. *People v. Caballes*, 221 Ill. 2d 282, 313-14 (2006). Defendant does not contend that this case presents an exception, so we confine our analysis to the fourth amendment.

- 4 -

state law may be an unreasonable one under that amendment, so may a search not expressly authorized by state law be justified as a constitutionally reasonable one.' " (quoting *Cooper v. California*, 386 U.S. 58, 61 (1967))); see also *United States v. Cartwright*, 630 F.3d 610, 614 (7th Cir. 2010) ("The existence of a police policy, city ordinance, or state law alone does not render a particular search or seizure reasonable or otherwise immune from scrutiny under the Fourth Amendment."). An as-applied challenge to a search or seizure authorized by statute is distinguishable in this respect from a facial challenge to the statute, which requires a defendant to "fulfill the difficult task of establishing the statute's invalidity under *any* set of facts." (Emphasis in original.) *People v. Garvin*, 219 Ill. 2d 104, 117 (2006).

¶ 13     At the hearing on a defendant's motion to suppress, the defendant bears the burden of establishing that the challenged search or seizure was unconstitutional and that the evidence obtained as a result should be suppressed. See 725 ILCS 5/114-12(b) (West 2010). Under Illinois law, a defendant makes out a *prima facie* case that a warrantless search or seizure was unreasonable by proving that he was doing nothing unusual to justify the intrusion. *People v. Liekis*, 2012 IL App (2d) 100774, ¶ 20. This is consistent with the well-established principle that warrantless searches and seizures are considered *per se* unreasonable, unless they fall within one of several specific, well-delineated exceptions. *Illinois v. McArthur*, 531 U.S. 326, 330 (2001); *People v. Stehman*, 203 Ill. 2d 26, 34 (2002). Once a defendant has made out a *prima facie* case, the burden of production shifts to the State to come forward with evidence to counter the defendant's *prima facie* case. *People v. Gipson*, 203 Ill. 2d 298, 306-07 (2003). Even though the burden of production shifts to the State, the ultimate burden of proof remains with the defendant. *Gipson*, 203 Ill. 2d at 307.

¶ 14     Here, the parties stipulated that defendant was doing nothing suspicious at the time of the stop and that Officers Schreiber and Siedsma stopped defendant's boat on the Fox River pursuant solely to section 2-2(a) of the Act (*i.e.*, not based on probable cause, reasonable suspicion, or a warrant). These stipulated facts satisfied defendant's *prima facie* case, thus shifting the burden of production to the State to produce evidence to counter his *prima facie* case. However, the trial court heard no additional evidence beyond the stipulated facts. On appeal, we are not limited to the stipulated facts from the hearing on defendant's motion to quash and suppress and may rely on the evidence presented at trial to the extent that it supports affirming the trial court's judgment. *People v. Brooks*, 187 Ill. 2d 91, 127-28 (1999). In reviewing a trial court's ruling on a motion to quash and suppress, where, as here, there is no factual or credibility dispute, and the question involves only the application of the law to the undisputed facts, our standard of review is *de novo*. *People v. Robinson*, 322 Ill. App. 3d 169, 173 (2001).

¶ 15     Turning to the merits of defendant's argument, defendant largely relies on motor-vehicle roadblock case law in support of his as-applied argument. At least in the motor-vehicle context, the United States Supreme Court has recognized fixed checkpoints or roadblocks that meet certain requirements as one of the well-delineated exceptions to the general prohibition against suspicionless, warrantless seizures. See *Illinois v. Lidster*, 540 U.S. 419, 421 (2004) (upholding a highway checkpoint at which police stopped motorists to ask them about a recent hit-and-run accident); *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 447 (1990)

(upholding a system of highway sobriety checkpoints); *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976) (upholding permanent, fixed checkpoints located away from the border as a means to combat illegal immigration). Generally, in deciding the constitutionality of a suspicionless stop of a motor vehicle, a court must look to " 'the gravity of public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.' " *Lidster*, 540 U.S. at 427 (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)). The interference with individual liberty consists of both the "objective intrusion" and the "subjective intrusion" created by the seizure. See, *e.g.*, *Martinez-Fuerte*, 428 U.S. at 558.

¶ 16        Suspicionless stops at fixed checkpoints or roadblocks are favored over suspicionless stops by roving patrols because the objective and subjective intrusions created by the seizure are minimized. See *Sitz*, 496 U.S. at 452-53. In *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975), United States Border Patrol agents made "roving-patrol stops" of vehicles near the border "without any suspicion that a particular vehicle [was] carrying illegal immigrants." *Brignoni-Ponce*, 422 U.S. at 882. In *Delaware v. Prouse*, 440 U.S. 648 (1979), state police officers conducted "discretionary spot checks" by sporadically and randomly pulling vehicles over to check for drivers' licenses and registrations. *Prouse*, 440 U.S. at 650, 659. In both cases, the Supreme Court held that the government's interest in either preventing illegal immigration (*Brignoni-Ponce*) or promoting public safety upon the roads (*Prouse*) did not justify the intrusion upon individuals' fourth amendment interests occasioned by the unsettling and disruptive nature of random, suspicionless traffic stops. See *Prouse*, 440 U.S. at 657 (describing "the physical and psychological intrusion visited upon the occupants of a vehicle by a random stop to check documents"); *Brignoni-Ponce*, 422 U.S. at 882 (stating that "roving-patrol stops *** would subject the residents of these and other areas to potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers"); see also *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973) (holding that search pursuant to statute that allowed United States Border Patrol agents to conduct warrantless searches within a "reasonable distance" of the border and without probable cause violated the fourth amendment). Even for the more favored checkpoint or roadblock, however, the primary purpose must be something other than "the general interest in crime control." (Internal quotation marks omitted.) *City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000).

¶ 17        *People v. Bartley*, 109 Ill. 2d 273 (1985), was the first case in which the Illinois Supreme Court held that a motor-vehicle checkpoint was constitutional under the fourth amendment. In *Bartley*, the checkpoint was set up on a five-lane highway, and officers used police vehicles with flashing lights to "funnel the westbound traffic into a single lane." *Bartley*, 109 Ill. 2d at 277-78. The decision to establish the roadblock was made in advance by supervisory personnel, and "[t]he plan was to stop every westbound vehicle unless traffic backed up." *Bartley*, 109 Ill. 2d at 277. The court discussed *Prouse* and *Martinez-Fuerte* and held that assessing the constitutionality of the checkpoint at issue required "balancing the public interest against the objective and subjective intrusion resulting from the stop." *Bartley*, 109 Ill. 2d at 285. The court explained that the objective intrusion concerns the level of physical intrusion and "is measured by such factors as the length of the stop, the nature of the questioning, and

whether a search is conducted." *Bartley*, 109 Ill. 2d at 281-82. The subjective intrusion concerns the level of psychological intrusion, such as the generating of fright or annoyance on the part of motorists. *Bartley*, 109 Ill. 2d at 282.

¶ 18    Addressing the public interest factor, the court concluded that driving under the influence of alcohol is unquestionably an extremely serious problem, such that it would "justify some intrusion on the unfettered movement of traffic in order to reduce alcohol-related accidents and deter driving under the influence." *Bartley*, 109 Ill. 2d at 285. Turning to the objective intrusiveness of the roadblock, the court held that it had been minimal. Each motorist had been detained for only 15 to 20 seconds unless further questioning was necessary; motorists were allowed to stay in their vehicles; and they were asked to produce driving credentials, a legitimate request. *Bartley*, 109 Ill. 2d at 287-88.

¶ 19    Addressing the degree of subjective intrusion occasioned by the roadblock, and by roadblocks generally, the court noted that there was no "ironclad formula" but that the factors relied upon by out-of-state courts were "illuminating." *Bartley*, 109 Ill. 2d at 289. The court stated that "[i]t is manifest that the fundamental evil to be avoided is the 'roving patrol.' " *Bartley*, 109 Ill. 2d at 288. The "crucial" inquiry, therefore, was "whether the field officers [were] acting with unbridled discretion." *Bartley*, 109 Ill. 2d at 289. The court looked to several factors pertinent to this question, such as whether the decision to establish the roadblock, and where to locate it, was made by supervisory personnel; whether vehicles were stopped in a preestablished, systematic fashion; and whether there were guidelines in place for operating the roadblock. *Bartley*, 109 Ill. 2d at 289-90. The absence of specific guidelines for identifying impaired drivers was not fatal in *Bartley*, as the roadblock had been established by supervisory personnel, who instructed the field officers on proper roadblock procedure, and the roadblock was "clearly a systematic operation." *Bartley*, 109 Ill. 2d at 290.

¶ 20    Besides the limitation on police discretion, other pertinent criteria that the court in *Bartley* considered were whether there was a sufficient showing that the operation was official, whether it was obvious that the roadblock was not unsafe, and the degree of advance publicity. *Bartley*, 109 Ill. 2d at 291-92. Not all of these secondary criteria were satisfied in *Bartley*, but the roadblock was held valid because, "while not a model roadblock," the subjective intrusion of the roadblock was "sufficiently limited to pass constitutional muster." *Bartley*, 109 Ill. 2d at 289.

¶ 21    We cannot resolve the issue here by looking solely to motor-vehicle roadblock case law. Pertinent to our case is *United States v. Villamonte-Marquez*, 462 U.S. 579 (1983), in which the Supreme Court upheld a federal statute (19 U.S.C. § 1581(a) (1976)) empowering customs agents lacking either a warrant or suspicion to board, examine, and search vessels at any place in the United States and examine the manifest and other documents. The defendants in *Villamonte-Marquez* had been convicted of conspiring to import marijuana after customs officials, lacking any suspicion of wrongdoing, stopped and boarded the defendants' sailboat on a waterway connecting the Gulf of Mexico with Lake Charles, Louisiana, and discovered marijuana. The court of appeals reversed the defendants' conviction, agreeing with the defendants' argument that the boarding of the ship was unconstitutional. *Villamonte-Marquez*,

462 U.S. at 583-84. The Supreme Court granted certiorari and reversed the court of appeals. *Villamonte-Marquez*, 462 U.S. at 593.

¶ 22    In upholding the constitutionality of the seizure, the Court observed initially that, in 1790, the First Congress passed the "lineal ancestor" of section 1581(a). *Villamonte-Marquez*, 462 U.S. at 584. The First Congress also passed the amendments that became the Bill of Rights, strongly implying that the framers of the fourth amendment did not regard section 1581(a) searches and seizures to be unreasonable. *Villamonte-Marquez*, 462 U.S. at 586-87; see *Boyd v. United States*, 116 U.S. 616, 623 (1886).

¶ 23    Second, the Court distinguished motor-vehicle cases such as *Brignoni-Ponce* and *Prouse*. Although, "if the customs officers in this case had stopped an automobile on a public highway near the border," the stop would have been unreasonable, there were crucial differences between "vessels located in waters offering ready access to the open sea and automobiles on principal thoroughfares in the border area." *Villamonte-Marquez*, 462 U.S. at 588. The Court explained:

> "[N]o reasonable claim can be made that permanent checkpoints would be practical on waters such as these where vessels can move in any direction at any time and need not follow established 'avenues' as automobiles must do. Customs officials do not have as a practical alternative the option of spotting all vessels which might have come from the open sea and herding them into one or more canals or straits in order to make fixed checkpoint stops. Smuggling and illegal importation of aliens by land may, and undoubtedly usually does, take place away from fixed checkpoints or ports of entry, but much of it is at least along a finite number of identifiable roads. But while eventually maritime commerce on the inland waters of the United States may funnel into rivers, canals, and the like, which are more analogous to roads and make a 'roadblock' approach more feasible, such is not the case in waters providing ready access to the seaward border, beyond which is only the open sea." *Villamonte-Marquez*, 462 U.S. at 589.

¶ 24    Third, the documentation system for vessels is "significantly different" from the prevailing state vehicle licensing system. Unlike license plates and other motor-vehicle insignia, a vessel's outward markings normally provide no indication whether it currently complies with state law; at the same time, the documentation requirements for vessels are more extensive and more complex than typical state motor-vehicle-license requirements. *Villamonte-Marquez*, 462 U.S. at 589-91. Fourth, the documentation laws that are enforced through section 1581(a) serve vital public purposes, including collecting duties and preventing the importation of illegal aliens and dangerous or prohibited articles. These interests are "most substantial in areas such as the ship channel in [*Villamonte-Marquez*], which connects the open sea with a Customs Port of Entry." *Villamonte-Marquez*, 462 U.S. at 591. Finally, as against the great need for documentation checks, the intrusion created by a section 1581(a) stop is modest, being limited to a brief detention, a visit to the vessel's public areas, and the inspection of documents. *Villamonte-Marquez*, 462 U.S. at 592.

¶ 25    In the wake of *Villamonte-Marquez*, a number of states have addressed the very issue before us. Compare *Peruzzi v. State*, 567 S.E.2d 15 (Ga. 2002) (upholding a suspicionless stop

authorized by a statute similar to section 2-2(a) of the Act), *State v. Eppinette*, 36,825-KA (La. App. 2 Cir. 2/11/2003), 838 So. 2d 189 (same), *State v. Pike*, 532 S.E.2d 543 (N.C. Ct. App. 2000) (same), and *Schenekl v. State*, 30 S.W.3d 412 (Tex. Crim. App. 2000) (same), with *State v. Allen*, 2013 Ark. 35 (invalidating a suspicionless stop authorized by a statute similar to section 2-2(a) of the Act), *State v. Carr*, 173 Ohio Ct. App. 3d 436, 2007-Ohio-5466, 878 N.E.2d 1077 (same), and *State v. Lecarros*, 66 P.3d 543 (Or. Ct. App. 2003) (same). State courts have varied in the extent to which they deem waterways amenable to some sort of checkpoint or roadblock. Even among those cases that have declared that checkpoints are impractical on bodies of water, state courts have differed in the extent to which they require limitations on the discretion of the officers conducting boat safety checks.

¶ 26    In *Schenekl*, which involved a defendant convicted of boating while intoxicated after a game warden stopped the defendant's boat on a lake for a routine safety check, the Court of Criminal Appeals of Texas concluded that checkpoints were not viable on waterways and seemed to require no evidence at all of limitations on officer discretion. The court observed that the state had "a high interest in promoting recreational water safety." *Schenekl*, 30 S.W.3d at 416. Although random safety checks were disapproved in *Prouse*, the court in *Schenekl* distinguished *Prouse* in two respects. *Schenekl*, 30 S.W.3d at 416. First, there was no less intrusive alternative to random stops, because "checkpoints are not a practical alternative on the water." *Schenekl*, 30 S.W.3d at 416 (citing *Villamonte-Marquez*, 462 U.S. at 592). Second, motorists have a higher expectation of privacy than do boaters, because automotive transportation is "basic, pervasive, [and] often necessary," while boating is "more commonly associated with recreation than necessity." *Schenekl*, 30 S.W.3d at 416. A special concurrence emphasized the limited objective intrusiveness of the stop but eschewed reliance on *Villamonte-Marquez*, in which "one of the most weighty considerations" was the difficulty of policing vessels with access to the open sea. *Schenekl*, 30 S.W.3d at 417 (Meyers, J., concurring, joined by Holland and Johnson, JJ.).

¶ 27    *Peruzzi* is a case in which, although the court echoed *Schenekl* in noting the impracticality of checkpoints on the waterway at issue, the court required some limitations on officer discretion. The defendant in *Peruzzi* was convicted of boating under the influence after his boat was stopped on Lake Peachtree, pursuant to a statute similar to section 2-2(a). *Peruzzi*, 567 S.E.2d at 15. The stop was part of a "mass inspection" that state conservation officers had undertaken at the direction of the county marshal; they were instructed that, ideally, they should stop "every boat" on the lake and check for registration and safety equipment. *Peruzzi*, 567 S.E.2d at 15. The Georgia Supreme Court upheld both the statute and the stop, concluding that the state's strong interest in boating safety outweighed any intrusion on individual privacy. *Peruzzi*, 567 S.E.2d at 16. The court observed:

> "Unlike cars traveling upon a public road, boats on an open body of water such as Lake Peachtree originate from a large number of docks and launches and need not follow any particular path. A roadblock is clearly infeasible and the emphasis in this case is on the procedural aspects of the stop." *Peruzzi*, 567 S.E.2d at 16-17.

The court relied on factors essentially identical to those that the Illinois Supreme Court in *Bartley* applied to motor-vehicle checkpoints. *Peruzzi*, 567 S.E.2d at 16. The objective

intrusion had been slight: the officers asked boaters only to show their licenses and the required equipment, which took at most a few minutes. *Peruzzi*, 567 S.E.2d at 16. The subjective intrusion had also been limited: the decision to conduct the inspection had been made by the county marshal; the instruction to check every boat if possible minimized officer discretion; and the officers had been in uniform and in marked boats. *Peruzzi*, 567 S.E.2d at 16.

¶ 28   *Carr* represents the other end of the spectrum from *Schenekl* and goes further than *Peruzzi* in applying motor-vehicle checkpoint case law to suspicionless stops of watercraft. In *Carr*, a conservation officer on routine patrol on Buckeye Lake State Park stopped the defendant's pontoon boat for a safety inspection. *Carr*, 173 Ohio Ct. App. 3d 436, 2007-Ohio-5466, 878 N.E.2d 1077, at ¶ 20. In invalidating the stop, the court observed that Buckeye Lake was "not open to the sea, so a checkpoint [was] a practical alternative, as noted by the U.S. Supreme Court in *Villamonte-Marquez*." *Carr*, 173 Ohio Ct. App. 3d 436, 2007-Ohio-5466, 878 N.E.2d 1077, at ¶ 20. The court further observed that the authorizing statute set "no limitations on the discretion of state officers in conducting [boat safety] inspections." *Carr*, 173 Ohio Ct. App. 3d 436, 2007-Ohio-5466, 878 N.E.2d 1077, at ¶ 20. Apparently, whether to stop any craft was "entirely within their discretion." *Carr*, 173 Ohio Ct. App. 3d 436, 2007-Ohio-5466, 878 N.E.2d 1077, at ¶ 20. Because there was no evidence that there had been a "properly authorized program to stop vessels" to check safety equipment or registration, the stop was unconstitutional. *Carr*, 173 Ohio Ct. App. 3d 436, 2007-Ohio-5466, 878 N.E.2d 1077, at ¶ 21. The court noted that the statute could be applied constitutionally; even lacking suspicion of a violation, an officer may legally stop a vessel "if there is a particularized checkpoint procedure designed and systematically administered to limit the discretion of officers." *Carr*, 173 Ohio Ct. App. 3d 436, 2007-Ohio-5466, 878 N.E.2d 1077, at ¶ 22. The application of this rule would be highly fact-specific, because "[t]he practicality of checkpoints either at docks or marinas or on the water *** will depend on the specific body of water." *Carr*, 173 Ohio Ct. App. 3d 436, 2007-Ohio-5466, 878 N.E.2d 1077, at ¶ 23.

¶ 29   After reviewing *Villamonte-Marquez* and the out-of-state cases that have addressed the issue before us, we find the approach of the Georgia Supreme Court in *Peruzzi* to be the most persuasive. Just as the court in *Peruzzi* concluded that a fixed checkpoint was infeasible on Lake Peachtree, a fixed checkpoint or "waterway roadblock" was not a viable alternative on the St. Charles Pool, which is the portion of the Fox River where defendant was stopped. In the area where defendant was stopped, the St. Charles Pool is 200 yards wide and is bordered by two dams. The officers testified that one dam is in St. Charles and the other is in South Elgin. St. Charles and South Elgin are located approximately 6½ miles apart. See *People v. Deleon*, 227 Ill. 2d 322, 326 n.1 (2008) (noting that a reviewing court may take judicial notice of the distance between two locations). Considering its length, there can be little doubt that, as with Lake Peachtree, the boat traffic on the St. Charles Pool originates from a number of docks and launches. See *Peruzzi*, 567 S.E.2d at 16. Moreover, according to Officers Siedsma and Schreiber, the area is popular with recreational boaters and has heavy boat traffic. It is suitable for "cruising around," as Yeomans testified. There were no "lane lines" or "buoy markers," and the officers were in a 14-foot boat. A 14-foot boat could not "block" a 200-yard-wide river,

- 10 -

nor could several boats for that matter. Similarly, a small boat could not allow for a serviceable stationary checkpoint.

¶ 30      Although the Court in *Villamonte-Marquez* suggested that fixed checkpoints might be practical in some inland waterways such as "rivers, canals, and the like," which are "more analogous to roads" than a waterway offering access to the open sea (*Villamonte-Marquez*, 462 U.S. at 589), we do not have a roadway-like waterway that is amenable to fixed checkpoints or roadblocks in this case. Instead, we have a wide river, bordered by two dams located a number of miles apart, that was used for recreational boating and had no established paths of travel. Surely a fixed checkpoint might be feasible in a river or canal that is no wider than a road and has fixed paths of travel, but a checkpoint in the St. Charles Pool, which far exceeds a roadway in size, would not be practical. See *Eppinette*, 838 So. 2d at 192 ("Lakes and waterways are different than 60-foot highway right-of-ways and do not easily lend themselves to stationary checkpoints."). More pertinent to our case is the language from *Villamonte-Marquez* that "no reasonable claim can be made that permanent checkpoints would be practical on waters such as these where vessels can move in any direction at any time and need not follow established 'avenues' as automobiles must do." *Villamonte-Marquez*, 462 U.S. at 589. The same rationale applies to the 200-yard-wide St. Charles Pool. Moreover, as the Court in *Villamonte-Marquez* reasoned, fixed checkpoints on a body of water larger than a canal or narrow river would be easy to avoid. *Villamonte-Marquez*, 462 U.S. at 589. The court in *Schenekl* explained:

> "Some boaters dock their boats at their homes rather than using public docks or boating ramps. If checkpoints were established only at public docks, lakeside residents would be forever immune from compliance with boating regulations. Even if checkpoints at docks were established, it would be an ineffective mechanism for enforcement, because a boater could comply with regulations while at the dock but be in noncompliance out on the lake." *Schenekl*, 30 S.W.3d at 415-16.

The same rationale is applicable here. In sum, we agree with the court's statement in *Peruzzi* that "[a] roadblock is clearly infeasible and the emphasis in this case is on the procedural aspects of the stop." *Peruzzi*, 567 S.E.2d at 16-17.

¶ 31      We further agree with *Peruzzi* that, although a fixed checkpoint or roadblock was not feasible in this case, it nevertheless is appropriate to apply an analysis similar to the one the Illinois Supreme Court in *Bartley* applied to motor-vehicle checkpoints. In applying such an analysis, the constitutionality of the boat safety stop at issue requires "balancing the public interest against the objective and subjective intrusion resulting from the stop." *Bartley*, 109 Ill. 2d at 285.

¶ 32      Regarding the public interest served by the boat safety stop conducted by Officers Siedsma and Schreiber, the Illinois General Assembly, in passing the Act, provided that "[i]t is the policy of this State to promote safety for persons and property in and connected with the use, operation and equipment of vessels and to promote uniformity of laws relating thereto." 625 ILCS 45/1-1 (West 2010). The State's interest in boating safety is akin to its interest in motor-vehicle safety. See *People v. Wells*, 241 Ill. App. 3d 141, 144 (1993) (upholding a safety checkpoint designed to check for improper lighting, seat belt violations, and expired license plates). We have no hesitation in concluding that the State's interest is important enough to

- 11 -

justify some level of intrusion on the unfettered movement of boaters. See *Bartley*, 109 Ill. 2d at 285 (noting that the problem of drunken driving is serious enough to "justify some intrusion on the unfettered movement of traffic in order to reduce alcohol-related accidents and deter driving under the influence"). The question becomes whether the intrusion in this case was minimal enough that it did not outweigh the State's interest. See *Bartley*, 109 Ill. 2d at 288.

¶ 33    Regarding the objective intrusiveness occasioned by the boat safety stop conducted by Officers Siedsma and Schreiber, the focus of the inquiry is on the physical intrusion caused by the stop, which "is measured by such factors as the length of the stop, the nature of the questioning, and whether a search is conducted." *Bartley*, 109 Ill. 2d at 281-82.

¶ 34    Beginning with the nature of the questioning, it is undisputed that Officers Siedsma and Schreiber stopped defendant's boat, and the other 20 to 25 boats they stopped that evening, pursuant to section 2-2(a) of the Act. The officers asked to see defendant's safety equipment and registration. According to Officer Siedsma, when conducting boat safety checks pursuant to the Act, the officers would "stop vessels and check for life jackets, *** fire extinguishers, sounding devices, or a horn or a whistle, [and] valid registration." Officer Schreiber testified to checking the same items, all of which the Act requires. See 625 ILCS 45/3-1 to 3-14 (West 2010) (requiring that boats be properly registered); 625 ILCS 45/4-1 (West 2010) (requiring that boats contain personal flotation devices); 625 ILCS 45/4-4 (West 2010) (requiring a whistle or horn); 625 ILCS 45/4-5 (West 2010) (requiring a fire extinguisher). Checking for a boater's registration and for these few specific items of safety equipment is akin to checking for motor-vehicle violations such as improper lighting, seat belt violations, or expired license plates and driver's licenses (*Wells*, 241 Ill. App. 3d at 144). Such questioning is brief and straightforward and concerns items that are easily produced.

¶ 35    Next, the officers did not search defendant's boat. After the officers hailed defendant's boat and identified themselves as conservation officers, defendant voluntarily showed the officers these items. The officers did not need to board defendant's boat, and defendant was able to show the officers the requested items "pretty much from where he was seated." The stop involved a purely visual inspection. Furthermore, it was approximately 6:45 p.m. on July 9, which means that it was daylight and the officers would not have been required to use flashlights to view defendant's equipment.

¶ 36    Turning to the length of the stop of defendant's boat, although the record does not reveal the exact length of the stop, the record suggests that it was not great. The goal of the officers' operation was limited. They were checking for registration and for three categories of boat safety equipment–personal flotation devices, a sounding device, and a fire extinguisher. The officers stopped 20 to 25 vessels between 2 p.m., when they put their boat in the water, and 6:45 p.m., when they hailed defendant's boat. The limited goal of the operation and the number of stops conducted within a relatively short period of time suggest that the length of each stop was short. In the case of the stop of defendant's boat, it was only after the officers observed numerous empty alcoholic beverage containers and defendant's glassy eyes and slurred speech that they developed reasonable suspicion that defendant was intoxicated and prolonged the stop beyond its original limited purpose. See *People v. Ruffin*, 315 Ill. App. 3d 744, 748 (2000) ("[An] initial stop may be broadened into an investigative detention *** if the officer discovers

specific, articulable facts which give rise to a reasonable suspicion that the defendant has committed, or is about to commit, a crime."). Until that point, however, defendant had simply shown the officers his registration and safety equipment from where he was seated, which would not have taken long.

¶ 37    In sum, we know that the nature of the officers' questioning was not intrusive and that no search was conducted. Although we do not know the exact length of the stop of defendant's boat, the evidence presented at trial demonstrates that the length of the stop was brief. Based on the record before us, we conclude that the objective intrusion in this case was minimal.

¶ 38    We next turn to the degree of subjective intrusion occasioned by the boat safety stop. The court in *Bartley* described the level of subjective intrusion as the "crucial question" in assessing the constitutionality of a DUI roadblock. *Bartley*, 109 Ill. 2d at 288. Subjective intrusion refers to the psychological intrusion caused by a stop, which relates to the generating of concern, fright, or annoyance on the part of citizens. *Bartley*, 109 Ill. 2d at 282. There is no "ironclad formula" for assessing the level of subjective intrusion. *Bartley*, 109 Ill. 2d at 289. As we discussed above, the court in Bartley looked for guidance to factors considered by out-of-state courts. See *Bartley*, 109 Ill. 2d at 289. The overarching goal is to determine "whether the field officers [were] acting with unbridled discretion." *Bartley*, 109 Ill. 2d at 289. This ensures that the "fundamental evil" of the roving patrol is avoided. *Bartley*, 109 Ill. 2d at 288.

¶ 39    Here, the officers' testimony that they stopped every boat they saw and stopped between 20 and 25 boats before defendant's boat indicates that the operation was systematic, such that the officers' discretion was limited. See *Peruzzi*, 567 S.E.2d at 16 (noting that the rangers' goal of conducting " 'safety checks of every boat on the lake' " limited their individual discretion in the process). Officer Schreiber testified that the officers stopped defendant's boat because the officers had neither seen nor stopped the boat previously that evening, which shows that the decision was not arbitrary but part of the officers' systematic efforts to stop every boat they saw. It further suggests that defendant was not singled out. The stop did not have the hallmarks of a stop made with unfettered discretion, such as a stop made on a "nonsystematic 'spot check' basis" (*Bartley*, 109 Ill. 2d at 291 (quoting *State v. Marchand*, 706 P.2d 225, 227 (Wash. 1985))) or on a "discretionary spot check[ ]" or a "sporadic and random" basis (*Prouse*, 440 U.S. at 657-58). The officers' reason for stopping defendant's boat stands in stark contrast to the rationale offered by the officer in *Prouse*: " 'I saw the car in the area and wasn't answering any complaints, so I decided to pull them off.' " *Prouse*, 440 U.S. at 650-51. By stopping every boat they saw, the officers effectively were eliminating their discretion regarding which boats to stop. See *McLendon v. State*, 945 So. 2d 372, 381 (Miss. 2006) ("[W]hen every vehicle traveling through the roadblock is stopped, as opposed to a random stopping of only some vehicles, the officers' discretion has been effectively removed ***."); see also *State v. Cloukey*, 486 A.2d 143, 146-47 (Me. 1985) (upholding the constitutionality of a roadblock where all vehicles were stopped, even though there was no written policy and the decision to establish the roadblock was not made by supervisory personnel); *Simmons v. Commonwealth*, 380 S.E.2d 656, 660 (Va. 1989) (Thomas, J., dissenting, joined by Whiting,

- 13 -

J.) ("[S]topping all cars at a roadblock satisfies the Supreme Court's concerns regarding limitations on intrusive police conduct and restraints on police discretion.").

¶ 40    Further, we know that Officers Siedsma and Schreiber were conducting what they referred to as either "boat patrol" or "routine boat patrol." According to both officers, boat patrol meant checking for registration and for specific items of safety equipment pursuant to the authority of the Act. Officer Siedsma's description of what constituted "boat patrol" was in the present tense–"[w]e check for valid registration," "we stop vessels and check for life jackets, *** fire extinguishers, *** a horn or a whistle," "[t]hose are the main things that we look for"–which suggests that the boat safety checks were part of a regular operation. Officer Schreiber explained that they would hail a boat by pulling up very close to the boat, identifying themselves as conservation officers, and asking the operator of the boat to put his boat in neutral. The officers' manner of interacting with defendant was consistent with the customary practices they described. The officers hailed defendant's boat in the manner described by Officer Schreiber. They then identified themselves as conservation officers. The officers then asked defendant to show his registration and the three specific types of safety equipment that the officers routinely checked. The boat safety check conducted by the officers was indicative not of unfettered or unconstrained discretion but of the execution of a regular and systematic registration and safety enforcement operation.

¶ 41    Not only does the evidence demonstrate that the boat patrol operation was regular and systematic, but it also indicates that the official nature of the operation was apparent. See *Bartley*, 109 Ill. 2d at 291 ("[T]he anxiety to motorists *** is allayed if there is a sufficient show of the official nature of the operation and if it is obvious that the roadblock in fact poses no safety risk."). The officers were in uniform, and Officer Schreiber described the uniform as consisting of an identifiable shirt, pants, black work boots, a hat with a star emblem representing law enforcement, and a life jacket with a star on it. Yeomans testified that, when the officers pulled over their boat, he and defendant "realized they were uniformed DNR [Department of Natural Resources] officers." Although the officers' boat was unmarked, the officers testified that it was a small, 14-foot, tiller-operated boat. Thus, the uniformed officers were in the open and visible to the boating public. Upon stopping defendant's boat, the officers identified themselves as conservation officers. The officers then asked to check registration and boat safety equipment, which were legitimate requests of a clearly official nature. All of these considerations support the conclusion that the subjective intrusion of the stop was minimal.

¶ 42    The evidence also paints a picture of a fairly mundane and friendly interaction between defendant and the officers, not of a jarring interaction characterized by concern, fear, or annoyance (*Bartley*, 109 Ill. 2d at 282) or by an "unsettling show of authority" (*Prouse*, 440 U.S. at 657). The officers' boat did not have a siren or flashing lights, and they stopped defendant's boat by pulling alongside it and hailing it by hand. The officers did not board defendant's boat, which undoubtedly reduced the level of psychological intrusion generated by the stop. Defendant was able to show the officers his registration and safety equipment "pretty much from where he was seated." According to the officers, defendant was "very friendly" and "was joking, he was happy the whole time." Yeomans testified that the officers "were joking

- 14 -

around with [defendant,] *** kind of like they were buddies with him or something" and that defendant "was real cooperative and just doing all the things they were asking him to do." Again, as we stated above, the interaction occurred in daylight, which also would have tended to decrease any anxiety generated by the stop.

¶ 43　　At a minimum, the evidence the State presented at trial supports the conclusion that the officers were not acting arbitrarily or with unbridled discretion and, therefore, that the subjective intrusion resulting from their stop of defendant's boat was minimal. We know from the evidence that the boat safety checks were part of a regular and systematic operation. We also know that the officers stopped defendant as part of their systematic efforts to stop every boat they saw. The procedure the officers used to hail defendant's boat and to check his registration and safety equipment was consistent with the customary safety check procedures the officers described. Further, the official nature of the operation was apparent, and there was no indication that the officers' stopping of defendant's boat resulted in anything other than minimal psychological intrusion. While we do not have evidence relevant to all of the factors addressed in *Bartley*–such as whether the decision to conduct the boat patrol was made by supervisory personnel (*Bartley*, 109 Ill. 2d at 289), whether there were preestablished or written guidelines on how to conduct the boat safety checks (*Bartley*, 109 Ill. 2d at 289-90), or whether there was advance publicity of the boat patrol operation (*Bartley*, 109 Ill. 2d at 291)–such factors serve as guideposts only and do not constitute an "ironclad formula" (*Bartley*, 109 Ill. 2d at 289). In light of the particular facts of this case, where the officers systematically stopped every boat they saw for the purpose of conducting a limited registration and safety check, we conclude that the absence of evidence relevant to the remaining *Bartley* factors does not undermine our conclusion that the officers' stop of defendant's boat was only minimally intrusive.

¶ 44　　The dissent suggests that it is "naive" not to conclude that the officers "were stopping boats and inspecting them for any and all violations that would be uncovered by plain-view observations." *Infra* ¶ 63. Apparently, the dissent is implying that the officers' stop of defendant's boat was pretextual, but defendant never challenged the stop as pretextual in the trial court or on appeal. The defendants in *Villamonte-Marquez* attempted to challenge the seizure of their boat as pretextual (*Villamonte-Marquez*, 462 U.S. at 584 n.3), but the Court "flatly dismissed the idea that an ulterior motive might serve to strip the agents of their legal justification" (*Whren v. United States*, 517 U.S. 806, 812 (1996) (discussing this aspect of *Villamonte-Marquez*)). Citing *Villamonte-Marquez* and other cases, the Court in *Whren* wrote that "these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." *Whren*, 517 U.S. at 813.

¶ 45　　Furthermore, even though the officers did conduct a "plain-view observation" of the open portions of defendant's boat, it was not a search and did not raise fourth amendment concerns. *Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."); see also *United States v. Lee*, 274 U.S. 559, 563 (1927) ("[N]o search of the high seas is shown. *** It is not shown that there was any exploration below decks or under hatches. For aught that appears, the cases of liquor were on deck and, like the defendants, were discovered before the

- 15 -

motorboat was boarded." (Emphases omitted.)). The only governmental action at issue here is the officers' seizure of the boat, which, as we concluded, was part of a regular and systematic boat safety enforcement operation.

¶ 46 The dissent also maintains that the majority "does not place *any* limitation on boat stops." (Emphasis in original.) *Infra* ¶ 58. Our analysis of the evidence in this case, which was not as "scant" as the dissent suggests (*infra* ¶ 58), forecloses this conclusion. The officers here briefly and systematically stopped every boat they saw for the limited purpose of checking for valid registration and boat safety equipment. Nothing in our holding condones random, nonsystematic, suspicionless seizures of individual boats by officers with unbridled discretion. Had these officers not stopped defendant's boat as part of a regular and systematic boat safety enforcement operation, the seizure likely would not have passed constitutional muster. But that is not the case before us.

¶ 47 Based on the evidence that the State presented at trial, which was uncontested by defendant, we cannot say that the trial court erred in denying defendant's motion to quash and suppress or his motion to reconsider. Defendant bore the burden of proof of establishing that the stop of his boat was unreasonable, but presented no evidence beyond the stipulated facts, which merely made a *prima facie* case of an unreasonable seizure. The evidence that the State presented at trial was sufficient to counter defendant's *prima facie* case. See *Gipson*, 203 Ill. 2d at 308 (reversing the trial court's grant of the suppression motion where the State countered the defendant's *prima facie* case with evidence of a proper inventory search and the defendant offered nothing to show that the search had been improper). Not only was a "waterway roadblock" or fixed checkpoint not a viable alternative on the St. Charles Pool, but also the State's important interest in promoting boating safety outweighed the minimal objective and subjective intrusions occasioned by the officers' stop of defendant's boat.

¶ 48                                                           CONCLUSION
¶ 49 The judgment of the circuit court of Kane County is affirmed.

¶ 50 Affirmed.

¶ 51 JUSTICE McLAREN, dissenting.
¶ 52 I respectfully dissent because I believe that the State has failed to counter defendant's *prima facie* case. I agree that the standard of review is *de novo*. However, I do not believe that the facts that the majority alludes to rebut the *prima facie* case. Put another way, I opine that the record does not establish the lack of unbridled discretion on the part of the officers as to who will be seized and where, how, and when the seizure will be imposed.

¶ 53 The majority considers *Villamonte-Marquez* with regard to the facts in this case. Many of the factors relied on in that case are not extant here. This case does not involve possible or probable smuggling, importing contraband, illegal aliens, or cargo. Furthermore, the Fox River is not akin to the open sea so as to establish that a "roadblock" is impractical. There is nothing to suggest that, on this relatively small portion of the Fox River, the officers would not have

been capable of spotting all vessels that might come from a boat landing or dock. The channel is 200 yards wide. The majority has taken the curious position that checkpoints are not feasible except in instances where a river is configured as a road. There is support in neither precedent nor logic to suggest that, as a matter of law, checkpoints are feasible only on rivers that are 40 feet wide or less. There is no explanation why the officers could not have set up a checkpoint in the middle of the channel and stopped every passing boat by using a siren or a bullhorn, whether in a marked or unmarked boat. More to the point, why were the officers in an unmarked boat?

¶ 54    The majority, referencing *Villamonte-Marquez*, opines that the documentation requirements for boats are more extensive and complex than typical motor-vehicle license requirements. I submit that there is no support in the record for such a conclusion. I believe that a vessel on the high seas, especially one that carries cargo and a manifest, is not comparable to a recreational boat on a dammed river several hundred yards in width. Not only are the vessels in different milieus, but they have different purposes and characteristics. Based upon the evidence presented, there is nothing to suggest to me that the registration requirements for these recreational vehicles are so substantially different from those for automobiles as to warrant a departure from the analysis applied to motor-vehicle roadblocks. The intrusion is no less intrusive than the intrusion imposed with roadblocks.

¶ 55    The majority decides to apply *Peruzzi* to the limited facts in this case. I submit that there are so few facts in this case that applying *Peruzzi* is nothing more than applying the holding in the case without actually comparing the facts in the two cases. As the Georgia Supreme Court related:

> "Further, the rangers in this case were conducting safety checks in substantial accord with the five factors identified by this court in *Brent v. State*, 270 Ga. 160, 510 S.E.2d 14 (1998). The decision to conduct safety and registration inspections on Lake Peachtree during the holiday was made by the Fayette County Marshal, not the officers conducting the inspections. The rangers goal was to 'do safety checks of every boat on the lake,' limiting their individual discretion in the process. The rangers were in uniform and in boats clearly marked as 'DNR Law Enforcement.' Unlike cars traveling upon a public road, boats on an open body of water such as Lake Peachtree originate from a large number of docks and launches and need not follow any particular path. A roadblock is clearly infeasible and the emphasis in this case is on the procedural aspects of the stop." *Peruzzi*, 567 S.E.2d at 16-17.

Unlike in the *Peruzzi* case (involving a lake of undefined dimensions), there is little, if anything, to suggest that the five factors were covered in this case to allow proper consideration of the nature and extent of the intrusion. The facts in this case were that this was a "routine patrol" via an unmarked boat without warning or communication equipment, on a river 200 yards wide, and nothing more.

¶ 56    As the court related in *Carr*, "the practicality of checkpoints either at docks or marinas or on the water *** will depend on the specific body of water." *Carr*, 173 Ohio Ct. App. 3d 436, 2007-Ohio-5466, 878 N.E.2d 1077, at ¶ 23. There is nothing in this record from which the majority may conclude that the State has established a constitutional basis for the kind of

- 17 -

seizure implemented in this case. There is nothing to suggest that there were numerous docks, marinas, or boat landings to support the bald conclusion that a fixed checkpoint was not a viable alternative. The majority's unsupported conclusion that there can be little doubt as to the number of access points assumes the absurdity that the absence of evidence can undoubtedly establish a declarative conclusion. The majority creates strawmen to establish the impracticality of a checkpoint on a waterway 200 yards wide. Apparently, the majority assumes that buoys, markers, or the placement in the middle of the channel of a marked boat with a siren and a megaphone would be impractical. But this speculation is neither my function nor the majority's function. We are supposed to decide the case based upon the facts of record, and the majority is essentially bootstrapping its holding by addressing hypotheticals that support its holding while disregarding hypotheticals that do not support its holding. Who decided what the size of the boat should be? Who decided whether it should be unmarked or marked? Who decided whether the DNR would make its presence known in ways that would identify itself to boaters or would not? Why no siren or even a bullhorn? The bottom line is that the majority, instead of looking at the dearth of facts establishing a lack of unbridled discretion, merely speculates that the unknown facts establish the five factors in *Peruzzi* and the necessity defined in *Villamonte-Marquez*.

¶ 57    The majority cites to *Schenekl* for the proposition that checkpoints would be easy to avoid. That may be true, but the State failed to prove or even present evidence to establish a basis for the majority to so conclude.

¶ 58    The majority also concludes that the stop was minimal as to time. Minimal is a relative term and the stop appears to have taken no less than the amount of time it would take to conduct a registration and equipment check of a motor vehicle. Assuming that each stop was the same and that the stops occurred in instantaneous succession, the time involved was 11 to 14 minutes. Had there been a checkpoint or a marked boat or a megaphone used to give advance warning, the stops could have been even shorter, as the boaters could have been prepared to display the registration and paraphernalia. In any event, the length of the stop does not establish that the officers acted without unbridled discretion (the fundamental evil). Surely it is not evident that any factors were presented for the trial court to even rule upon. Additionally, unlike in *Peruzzi*, the majority does not place *any* limitation on boat stops; indeed, because here the evidence is so scant, the majority is essentially holding that if a stop is done as part of a "routine patrol" it is constitutional.

¶ 59    Contrary to what the majority opines, I do not believe that the expectation of privacy is attenuated by characterizing the activity as recreation rather than necessity.

¶ 60    As stated in *Carr*, the analysis is based upon the specific facts in each case. The specific facts in this case are so minimal that they virtually encompass any scenario other than racial profiling. In my opinion the State has not presented sufficient evidence for us to effectively balance the interests of the individual and the State. Also, there was no evidence to establish the reasonableness of this intrusion in lieu of some less intrusive method. Simply put, there was a dearth of evidence to properly conclude that the intrusion was worthwhile and was based upon accepted factors used to determine the constitutionality of applying a statute that gives the State *carte blanche* to intrude upon any boating activity and seize any person.

- 18 -

¶ 61    The majority discusses the systematic inspection of all the boats the officers saw. Apparently, there were no boats tied up to docks or in cradles. If the officers had seen those boats and not stopped to check them, then they did not inspect all boats they saw. However, the record does not reflect whether there were even docks on this portion of the river, so it is speculative to suggest what they saw. But it also is speculative to suggest, as the majority does, that a checkpoint would have been unavailing because there were multiple docks, marinas, and public boat landings.

¶ 62    The majority essentially determines that any regular, systematic routine patrol is bereft of unbridled discretion. I submit that a "systematic, routine patrol" pursuant to the statute is a patrol with unbridled discretion to stop boaters, for any violation or none. According to the majority, as long as the stops include all possible boats there is not unbridled discretion, because they are systematic. As regards "regular" routine patrol, the majority does not explain what regular *vis-á-vis* irregular routine patrol is except that one is acceptable and the other is not. The record is lacking in relating how a regular patrol comports with the factors concerning permissible seizures. I submit that it is inconsistent to conclude that the exercise of discretion to stop everyone is acceptable with boats but not motor vehicles. It is merely one factor, not the *sine qua non*. The fact that routine patrol is regular is an immaterial characteristic bordering upon redundancy.

¶ 63    It would seem that, in addition to checking for safety equipment, the officers were also inspecting for other violations of the law. To conclude that a routine patrol did not also include plain-view inspections of every boat and operator is naive. I submit that, aside from the "main things they look for," these officers were stopping boats and inspecting them for any and all violations that would be uncovered by plain-view observations. The fact that they were in an unmarked boat establishes that their actions were not readily apparent. An officer in an unmarked squad car is not apparent until the officer exits the squad. Contrary to the majority's representation, the witnesses did not testify that they knew they were being stopped by officers in uniform or that the officers were open and visible to the boating public before they were beside the boat. All these considerations do not suggest that the intrusion was minimal as much as they show that the stop was abrupt and without notice. The interaction between the parties was mundane only until the officers made a plain-view inspection of the boat.

¶ 64    The majority adds that the fact that it was daylight tended to decrease any anxiety generated by the stop. There is no citation to authority and I am not aware of any study that implies, let alone determines, that daylight stops are less intrusive, onerous, or anxious.

¶ 65    The majority decides that the law was not unconstitutional as applied to these facts. Unfortunately, the facts are so minimal that they fail to show that the officers were limited by the strictures of what constitutes a reasonable stop with minimal discretion. Most of the conclusions drawn by the majority are conclusions based upon facts that are vague and equivocal. The majority has let the State prevail when it failed to sustain its burden of rebutting the *prima facie* case. With the State having failed to establish foundational facts to suggest that the routine patrol was less than *carte blanche*, defendant should prevail in this case. The State did not sustain its burden despite the majority's declaration that it did.